PARIENTE, J.
In this appeal involving legal issues of first impression, we review a trial court’s finding that the 2012 “redistricting process” and the “resulting map” apportioning Florida’s twenty-seven congressional districts were “taint[ed]” by unconstitutional intent to favor the Republican Party and incumbent lawmakers.[1] Cognizant that this Court’s role is not to select a redistricting map that performs better for one political party or another, but is instead to uphold the purposes of the constitutional provision approved by Florida voters to outlaw partisan intent in redistricting, the crux of what we must decide is whether the trial court gave the appropriate legal effect to its finding that the Florida Legislature drew the state’s congressional districts in violation of the Florida Constitution.
Added to the Florida Constitution in 2010, the Fair Districts Amendment sought to eliminate the age-old practice of partisan political gerrymandering — where the political party and representatives in power manipulate the district boundaries to their advantage — by forbidding the Florida Legislature from drawing a redistricting plan or an individual district with the “intent to favor or disfavor a political party or an incumbent.” Art. Ill, § 20(a), Fla. Const. “The desire of a political party to provide its representatives with an advantage in reapportionment is not a Republican or Democratic tenet, but applies equally to both parties.” In re Senate Joint Resolution of Legislative Apportionment 1176 (Apportionment I), 83 So.3d 597, 615 (Fla.2012). As observed when a three-judge panel of a federal district court examined Florida’s last decennial congressional redistricting plan in 2002, the “raw exercise of majority legislative *370 power does not seem to be the best way of conducting a critical task like redistricting, but it does seem to be an unfortunate fact of political life around the country.” Martinez v. Bush, 234 F.Supp.2d 1275, 1297 (S.D.Fla.2002).
With the voters’ approval of the Fair Districts Amendment, that unfortunate fact of political life was banned in Florida. Our citizens declared that the Legislature must “redistrict in a manner that prohibits favoritism or discrimination.” Apportionment I, 83 So.3d at 632. And the Eleventh Circuit Court of Appeals similarly declared •that “[f]ar from dictat[ing] electoral outcomes, the provision seeks to maximize electoral possibilities by leveling the playing field.” Brown v. Sec’y of State of Fla., 668 F.3d 1271, 1285 (11th Cir.2012) (internal quotation marks omitted).
Like the voters of Arizona, who adopted an independent redistricting commission recently upheld by the United States Supreme Court as consistent with the “fundamental premise that all political power flows from the people,” the Florida voters endeavored “to address the problem of partisan gerrymandering — the drawing of legislative district lines to subordinate adherents of one political party and entrench a rival party in power.” Ariz. State Legislature. v. Ariz. Indep. Redistricting Comm’n, No. 13-1314, — U.S. —, 135 S.Ct. 2652, 2658, 192 L.Ed.2d 704, 2015 WL 2473452, at *4, 21 (U.S. June 29, 2015). As the United States Supreme Court has recognized, “partisan gerrymanders ... [are incompatible] with democratic principles.” Id. at *4, —, 135 S.Ct. 2652, 2658 (alteration in original) (quoting Vieth v. Jubelirer, 541 U.S. 267, 292, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (plurality opinion)). In short, the Fair Districts Amendment was designed “to restore ‘the core principle of republican government,’ namely, ‘that the voters should choose their representatives, not the other way around.’ ” Id. at *21, —, 135 S.Ct. 2652, 2677 (quoting Mitchell N. Berman, Managing Gerrymandering, 83 Texas L.Rev. 781, 781 (2005)).[2]
Presented in this case with a first-of-its-kind challenge under the Fair Districts Amendment, the trial court found that the Legislature’s 2012 congressional redistricting plan was drawn in violation of the Florida Constitution’s prohibition on partisan intent. We affirm that finding. We conclude, however, that the trial court failed to give proper legal effect to its determination that, the Fair Districts Amendment was violated.
In reaching this conclusion, we recognize that the trial court had scant precedent to guide it in approaching the legal issues presented. And, we commend the trial court for the tremendous effort that was expended in deciding this novel challenge under the Fair Districts Amendment.
Nevertheless, we conclude that two legal errors significantly affected the trial *371 court’s determination of the appropriate legal effect of its finding of unconstitutional intent. First, the trial court erred in determining that there was no distinction between a challenge to the “plan as a whole” — a challenge, in effect, to the map produced from the unconstitutional “process” — and a challenge to individual districts. Second, the trial court erred in the standard of review it applied, which was improperly deferential to the Legislature’s decisions after finding a violation of the Fair Districts Amendment’s prohibition on partisan intent. Although it found the existence of unconstitutional intent, the trial court relied solely on objective “tier-two” constitutional indicators, such as compactness and the use of political or geographical boundaries, rather than on the direct and circumstantial evidence of “tier-one” unconstitutional intent presented at trial.
In' other words, the trial court analyzed the Legislature’s map as if it had not found the existence of unconstitutional intent, affording deference to the Legislature where no deference was due. Once a direct violation of the Florida Constitution’s prohibition on partisan intent in redistricting was found, the burden should have shifted to the Legislature to justify its decisions in drawing the- congressional district lines.
Relying on the finding of unconstitutional intent, the challengers have urged that the entire plan should be redrawn. Certain factors support this approach, which would require the Legislature to begin the redistricting process anew on a blank slate. For example, we are aware that the starting point for drawing the 2012 congressional redistricting map was the 2002 map, which was drawn prior to the Fair Districts Amendment with, at that time, legally permissible partisan intent. In fact, the Legislature itself had, in defending against a racial gerrymandering claim directed at the 2002 map, “stipulated” that its intent “was to draw the congressional districts in a way that advantages Republican incumbents and potential candidates.” Martinez, 234 F.Supp.2d at 1340. We also acknowledge that a three-judge federal district court panel concluded that the Florida Legislature’s “overriding goal with respect to congressional reapportionment” in 2002 was to “maximize the number of districts likely to perform for Republicans.” Id. at 1300-01. These are considerations now explicitly outlawed by the Florida Constitution’s prohibition on partisan political gerrymandering.
Based on the findings and evidence in this case, however, we ultimately reject the challengers’ request that the entire plan must be redrawn or that this Court should, at this time, perform the task of redrawing the districts. Although we conclude that the trial court’s finding of unconstitutional intent required the burden to shift to the Legislature to justify its decisions regarding where to draw the lines, we also conclude that the challengers still must identify some problem with the Legislature’s chosen configuration. They did' so in this case with respect to Districts 5, 13, 14, 26, and 27 — showing a nexus between the unconstitutional intent and the district — as well as for Districts 21, 22, and 25, which they contended were problematic either for “tier-two” reasons or because the Legislature unjustifiably rejected a less favorable configuration.
Accordingly, while we affirm the trial court’s finding that the Legislature’s enacted map was “taint[ed]” by unconstitutional intent, we reverse the trial court’s order upholding the Legislature’s remedial redistricting plan. ■ We relinquish this case to the trial court for a period of 100 days from the date of this opinion, with directions that it require the Legislature to redraw, on an expedited basis, Congres *372 sional Districts 5, 13, 14, 21, 22, 25, 26, 27, and all other districts affected by the redrawing, pursuant to the guidelines set forth in this opinion. We emphasize the time-sensitive nature of these proceedings, with candidate qualifying for the 2016 congressional elections now less than a year away, and make clear that we take seriously our obligation to provide certainty to candidates and voters regarding the legality of the state’s congressional districts. Upon the completion of the redrawing of the map, the trial court shall hold a hearing where both sides shall have an opportunity to present their arguments and any evidence for or against the redrawn map, and the trial court shall then enter an order either recommending approval or disapproval of the redrawn map.
We commend both parties for their professionalism in presenting the case to this Court and now proceed to discuss in detail the legal issues that have been raised on appeal, the background of this case, the evidence presented, and our legal reasoning.
I. CHALLENGE TO TRIAL COURT’S FINDINGS
On appeal in this Court, the challengers seek affirmance of the trial court’s finding of unconstitutional partisan intent in drawing the state’s congressional districts — a finding that was based on both direct and circumstantial evidence. Their primary contention of error, however, is that the trial court applied an unduly deferential standard of review, thereby precluding it from imposing a more meaningful remedy for its finding of unconstitutional intent to favor the Republican Party and incumbents.[3]
The Legislature, while seeking affir-mance of the trial court’s approval of the remedial redistricting plan, nevertheless takes issue with the trial court’s finding of unconstitutional intent.[4] In particular, the *373 Legislature contests, first, the trial court’s finding of a connection between the evidence and the Legislature itself, including the trial court’s decision to ascribe the intent of a few individuals to the Legislature as a collective body. Second, the Legislature asserts that, even assuming the existence of unconstitutional intent, the trial court’s finding pertains solely to the two invalidated districts and not to the broader process or map as a whole. Accordingly, the Legislature argues that any remedy that may have been necessary has already been provided through the enactment of the remedial redistricting plan.
We address these issues in the following way. After setting forth a comprehensive overview of the factual and legal background of the case, including a review of the evidence relied on by the trial court in finding unconstitutional intent, our analysis begins by considering the “intent” standard and the trial court’s application of that standard in this case. Upon determining that the trial court appropriately framed the “intent” inquiry, we turn to the legal sufficiency of the trial court’s finding of unconstitutional intent. We conclude that competent, substantial evidence supports the trial court’s finding and that this finding pertains to the plan as a whole and not solely to the two invalidated districts. We then proceed to consider the proper legal effect of this finding as we review each challenged district. Finally, we address the remedy.[5]
II. THE FLORIDA CONSTITUTION’S PROHIBITION ON PARTISAN POLITICAL GERRYMANDERING
In February 2012, “the Florida Legislature approved the decennial plan apportioning Florida’s twenty-seven congressional districts, based on population data derived from the 2010 United States Census.” League of Women Voters of Fla. v. Fla. House of Representatives (Apportionment IV), 132 So.3d 135, 139 (Fla.2013). After the adoption of the Legislature’s 2012 congressional redistricting plan, two separate groups of plaintiffs (“the challengers”) [6] filed civil complaints in the Second Judicial Circuit Court in and for Leon County, challenging the validity of the plan under new state constitutional redistricting standards approved by the Florida voters in 2010 and now enumerated in article III, section 20, of the Florida Constitution. “Those standards, governing the congressional reapportionment process, appeared on the 2010 general election ballot as *374 ‘Amendment 6’ and, together with their identical counterparts that apply to legislative reapportionment (‘Amendment 5’), were generally referred to as the ‘Fair Districts’ amendments.” Id.[7] As this Court has previously noted, “[t]here is no question that the goal of minimizing opportunities for political favoritism was the driving force behind the passage of the Fair Districts Amendment.” Apportionment I, 83 So.3d at 639.
In Apportionment I, during this Court’s first review involving the new constitutional standards, we commended the Legislature for what it claimed at that time to be an unprecedented transparent redistricting process, in which the Legislature engaged in twenty-six public hearings around the state and obtained public input as it went about its task of redistricting. See 83 So.3d at 637 n. 35, 664. In truth, public input in redistricting was not unique to the 2012 process. The Legislature held thirty-three public hearings during the 1992 redistricting and twenty-four public hearings prior to the enactment of the 2002 map. See Martinez, 234 F.Supp.2d at 1288.
Based on the new constitutional standards that applied for the first time to the 2012 process, transparency became legally significant under the Florida Constitution. This Court explained that “if evidence exists to demonstrate that there was an entirely different, separate process that was undertaken contrary to the transparent effort in an attempt to favor a political party or an incumbent in violation of thé Florida Constitution, clearly that would be important evidence in support of the claim that the Legislature thwarted the constitutional mandate.” Apportionment IV, 132 So.3d at 149. Indeed, the challengers’ principal claim in this litigation challenging the constitutional validity of the Legislature’s 2012 congressional redistricting plan involved evidence of the type of “entirely different, separate process” this Court warned would be “important evidence” of a constitutional violation.
Specifically, the challengers argued that the Legislature cooperated and collaborated with partisan political operatives aligned with the Republican Party to produce a redistricting plan that was drawn in contravention of article III, section 20, with the intent to favor incumbents and the Republican Party, which was the controlling political party in the Legislature at the time of the 2012 redistricting. Before the approval of the Fair Districts Amendment, this Court had previously acknowledged, in 1992, that there was “little doubt that politics played a large part” in the adoption of prior redistricting plans in this state, explaining that the protection of incumbents and favoritism of one party over another was inevitable — and certainly “not illegal.” In re Senate Joint Resolution 2G, Special Apportionment Session 1992 (In re Apportionment Law-1992), 597 So.2d 276, 285 (Fla.1992). But at that time, such partisan intent was not legally prohibited.
The acceptability of partisan political gerrymandering in this state dramatically changed in 2010. With “fairness” as its “focus,” the Fair Districts Amendment now “expressly prohibits” redistricting “practices that have been acceptable in the past, such as crafting a plan or district with the intent to favor a political party or an incumbent.” Apportionment I, 83 So.3d at 605, 607, 616. These “express new standards” thus afford Florida citi *375 zens “explicit constitutional protection” under article III, section 20, of the Florida Constitution, “against partisan political gerrymandering.” Apportionment IV, 132 So.3d at 138-39.
Specifically, article III, section 20, of the Florida Constitution, provides in its entirety as follows:
In establishing congressional district boundaries:
(a) No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect represen-' tatives of their choice; and districts shall consist of contiguous territory.
(b) Unless compliance with the standards in this subsection conflicts with the standards in subsection (a) or with federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries.
(c) The order in which the standards within subsections (a) and (b) of this section are set forth shall not be read to establish any priority of one standard over the other within that subsection.
Art. Ill, § 20, Fla. Const.
Under article III, section 20, “there is no acceptable level of improper intent.” Apportionment I, 83 So.3d at 617. The prohibition on improper partisan intent in redistricting applies, “by its express terms,” to “both the apportionment plan as a whole and to each district individually” and does not “require a showing of malevolent or evil purpose.” Id. A finding of partisan intent therefore renders the Legislature’s redistricting plan constitutionally invalid, as the Florida Constitution expressly “outlaw[s] partisan political gerrymandering.” Apportionment TV, 132 So;3d at 137. As we explained in Apportionment I:
The Florida Constitution now expressly prohibits what the United States Supreme Court has in the past termed a proper, and inevitable; consideration in the apportionment process.
Florida’s express constitutional standard, however, differs from equal protection political gerrymandering claims under either the United States or Florida Constitutions. Political gerrymandering claims under the Equal Protection Clause of the United States Constitution focus on determining when partisan districting as a permissible exercise “has gone too far,” so as to “degrade a voter’s or a group of voters’ influence on the political process as a whole.”
In contrast to the federal equal protection standard applied to political gerrymandering, the Florida Constitution prohibits drawing a plan or district with the intent to favor or disfavor a political party or incumbent; there is no acceptable level of improper intent. It does not reference the' word “invidious” as the term has been used by the United States Supreme Court in equal protection discrimination cases, and Florida’s provision should not be read to require a showing of malevolent or evil purpose.
83 So.3d at 616-17 (citations omitted).
“Florida’s constitutional provision prohibits intent, not effect,” which is to say that a map that has the effect or result of favoring one political party over another is not per se unconstitutional in the absence of improper intent. Id. at 617. “Thus, the focus of the analysis must be on both direct and circumstantial evidence of *376 intent.” Id. “One piece of evidence in isolation may not indicate intent, but a review of all of the evidence together may lead this Court to the conclusion that the plan was drawn for a prohibited purpose.” Id at 618. The relevant inquiry for discerning improper partisan intent “focuses on whether the plan or district was drawn with this purpose in mind.” Id.
A. TRIAL COURT’S FINDING OF UNCONSTITUTIONAL INTENT
The challengers’ claim of unconstitutional intent in the enacted congressional redistricting plan was that the Legislature communicated and collaborated with partisan political operatives, in the shadow of the Legislature’s purportedly open and transparent redistricting process, to produce a map favoring Republicans and incumbents. After hearing all the evidence presented during a twelve-day bench trial held from late May to early June 2014, and evaluating the credibility of all the witnesses, the trial court found that the challengers had proven their case and concluded that the Florida Legislature’s enacted 2012 congressional redistricting plan was drawn in violation of article III, section 20.
The introductory paragraph of the trial court’s judgment stated that “districts 5 and 10 were drawn in contravention of the constitutional mandates of Article III, Section 20,” but, in its discussion throughout the course of its forty-one-page order, the trial court more generally referred to and found that a group of partisan political operatives “conspire[d] to manipulate and influence the redistricting process ” and succeeded in “infiltrating] and influencing] the Legislature, to obtain the necessary cooperation and collaboration” to “taint the redistricting process and the resulting map with improper partisan intent.” (Emphasis supplied.)
Specifically, the trial court stated, in pertinent part, as follows:
[The challengers’] theory of the case regarding improper intent is that Republican leadership in the House and the Senate, their key staff members, and a small group of Republican political consultants conspired to avoid the effective application of the Fair District Amendments to the redistricting process and thereby successfully fashioned a congressional map that favors the Republican Party and its incumbents. The strategy they came up with, according to the [challengers], was to present to the public a redistricting process that was transparent and open to the public, and free from partisan influences, but to hide from the public another secretive process. In this secretive process, the political consultants would make suggestions and submit their own partisan maps to the Legislature through that public process, but conceal their actions by using proxies, third persons who would be viewed as “concerned citizens,” to speak at public forums from scripts written by the consultants .and to submit proposed maps in their names to the Legislature, which were drawn by the consultants.
What is clear to me from the evidence, as described in more detail below, is that this group of Republican political consultants or operatives did in fact conspire to manipulate and influence the redistricting process. They accomplished this by writing scripts for and organizing groups of people to attend the public hearings to advocate for adoption of certain components or characteristics in the maps, and by submitting maps and partial maps through the public process, all with the intention of obtaining enacted maps for the State *377 House and Senate and for Congress that would favor the Republican Party.
They made a mockery of the Legislature’s proclaimed transparent and open process of redistricting by doing all of this in the shadow of that process, utilizing the access it gave them to the decision makers, but going to great lengths to conceal from the public their plan and their participation in it. They were successful in their efforts to influence the redistricting process and the congressional plan under review here. And they might have successfully concealed their scheme and their actions from the public had it not been for the [challengers’] determined efforts to uncover it in this case.
The closer question is whether the Legislature in general, or the leadership and staff principally involved in drawing the maps, knowingly joined in this plan, or were duped by the operatives in the same way as the general public. The Defendants argue that( if such a conspiracy existed, there is no proof that anyone in the Legislature was a part of it. If portions of the operatives’ maps found their way into the enacted maps, they say, it was not because leadership or staff were told or knew they came from this group, but rather because the staff, unaware of their origins, saw the proposals as improving the draft maps they were working on.
The most compelling evidence in support of this contention of the Defendants is the testimony of the staff members who did the bulk of the actual map drawing for the Legislature. I had the ability to judge the demeanor of Alex Kelly, John Guthrie and Jason Poreda at trial and found each to be frank, straightforward and credible. I conclude that they were not a part of the conspiracy, nor directly aware of it, and that significant efforts were made by them and their bosses to insulate them from direct partisan influence. I accept' that their motivation in drawing draft maps for consideration of the Legislature was to produce a final map which would comply with all the requirements of the Fair District Amendments, as their superiors had directed them.

That being said, the circumstantial evidence introduced at trial convinces me that the political operatives managed to find other avenues, other ways to infiltrate and influence the Legislature, to obtain the necessary cooperation .and collaboration to ensure that their plan was realized, at least in part. They managed to taint the redistricting process and the resulting map with improper partisan intent. There is just too much circumstantial evidence of it, too many coincidences, for me to conclude otherwise.

(Emphasis supplied.)
Having reviewed the trial court’s factual findings and the record, and viewing the evidence in the light most favorable to the trial court’s finding of unconstitutional intent, we set forth the following relevant factual background of the case. See Berges v. Infinity Ins. Co., 896 So.2d 665, 676 (Fla.2004) (explaining that it “is not the function of this Court to substitute its judgment for that of the trier of fact”); Markham v. Fogg, 458 So.2d 1122, 1126 (Fla.1984) (stating that an appellate court “should not substitute its judgment for that of the trier of fact” as long as there is competent, substantial evidence to support the findings, and concluding upon review of conflicting evidence that there was “ample credible evidence adduced at the trial to sustain the trial judge’s findings”); see also Hausdorff v. Hausdorff, 913 So.2d 1267, 1268 (Fla. 4th DCA 2005) (viewing the evidence in the light most favorable to *378 the challenged judgment in ■ evaluating whether competent, substantial evidence supported the trial court’s rulings); Mesick v. Loeser, 311 So.2d 132, 136 (Fla. 2d DCA 1975) (findings by the lower court as a trier of fact come to the appellate court “clothed with a heavy presumption of correctness and where there is substantial competent evidence to sustain the actions of the trial court,” the appellate court cannot substitute its own opinion on the evidence but “must indulge every fact and inference in support of that judgment,” which is the equivalent of a jury verdict). We note, given the nature of the challengers’ claim, that circumstantial evidence is often essential in proving a conspiracy— and indeed may be the only type of evidence available. See Anheuser-Busch, Inc. v. Campbell, 306 So.2d 198, 199 (Fla. 1st DCA 1975) (“It is a well settled rule that circumstantial evidence is admissible in civil conspiracy cases.”); see also Resnick v. State, 287 So.2d 24, 26 (Fla.1973) (holding that a criminal conspiracy need not be proved by only direct evidence).
As we recount the facts, we emphasize that not every meeting held or every communication made was improper, illegal, or even violative of the letter of the Fair Districts Amendment. We set forth the pertinent facts in the record because, collectively, the evidence that the challengers were able to uncover after a protracted discovery process demonstrates a different scenario than the entirely open and transparent process touted by the Legislature when this Court considered the original apportionment challenges to the state Senate and House maps in Apportionment I. This is, indeed, what the trial court — which heard and considered all this evidence— found.
We also emphasize that since many of the e-mails were deleted or destroyed, we still may have only a partial picture of the behind-the-scenes political tactics. As the trial court found, “the Legislators and the political operatives systematically deleted almost all of their e-mails and other documentation relating to redistricting.” The Legislature did so even though it had acknowledged that litigation over the redistricting plan was “a moral certainty.” Indeed, if not for the production of some documents from the political consultants, including Marc Reichelderfer and Pat Bainter, there would be no record of the separate process undertaken by the consultants and no way to establish whether or not this process involved the collusion of the Legislature and ultimately affected the enacted map, as the trial court concluded.
We further understand that “taking the politics out of politics” is itself a difficult challenge, considering that partisan political gerrymandering was the norm for both political parties during prior redistricting processes in this state. Nevertheless, the facts that we recount provide the backdrop as to why we reject the Legislature’s defense — which focuses on the political consultants’ efforts to “influence the redistricting process” and “make themselves relevant” despite their “exclusion from the decision-making process” — that depicts the political consultants and a few errant staffers as independent, self-motivated culprits, individuals who did not have the ability to and did not, in fact, influence the Legislature’s decisions regarding where to draw the lines. • And, finally, we emphasize that a finding of unconstitutional intent to favor a political party or incumbent does not necessarily mean that those who made the decisions acted with “malevolent or evil purpose,” which is not required for a finding of unconstitutional intent under the Fair Districts Amendment. Apportionment I, 83 So.3d at 617.
B. EVIDENCE OF UNCONSTITUTIONAL INTENT
A month after the Florida voters approved the Fair Districts Amendment dur *379 ing the November 2010 general election, then-Speaker of the House Dean Cannon authorized a meeting in December 2010 at the headquarters of the Republican Party of Florida, involving Republican political consultants and legislative staffers, to discuss the upcoming redistricting process. This gathering was described by one of the consultants at trial as a meeting of “people that, prior to passage of the [new constitutional standards], would have generally been involved in the redistricting process.”
The four key political consultants in attendance, who became major figures in the redistricting trial, were (1) Rich Heffley, (2) Frank Terraferma, (3) Marc Reichel-derfer, and (4) Pat Bainter. Heffley is a consultant who has worked with many Republican legislators and candidates for public office, including Senator Don Gaetz, the Chairman of the 2012 Senate Committee on Reapportionment. Heffley had been involved in prior redistricting processes in Florida in 1992 and 2002 and, by the summer of 2011, was being paid $10,000 per month by the Republican Party of Florida for unspecified redistricting services. Terraferma is also a consultant who has worked for a number of Republican legislators and candidates, including Representative Will Weatherford, the Chairman of the 2012 House Redistricting Committee. Terraferma had previously been hired by Heffley to work for the Republican Party of Florida and went back to work for the party as Director of House campaigns in 2011. He was described by employees of a national Republican organization, in an invitation for a meeting held in Washington, D.C., in June 2011 with key individuals involved in the redistricting process, as a “genius map drawer.” Rei-chelderfer is another consultant who has worked with several Republican legislators and candidates, including former Speaker Dean Cannon. Reichelderfer is also one of Cannon’s longtime personal friends, dating back over twenty years to their days together as Young Republicans. He was, at the time of the 2012 redistricting, considered part of Cannon’s “inner circle,” and he had a good working relationship with Heffley. Bainter is the owner of a Gaines-ville, Florida, based political consulting firm known as Data. Targeting, Inc., which has as one of its largest clients the Republican Party of Florida. Between January of 2011 and November of 2012, the Republican Party of Florida paid Data Targeting, Inc., almost $3 million for consulting, polling, and direct mail services.
These four consultants, along with employees of the Republican Party of Florida, met in the initial December 2010 meeting with Alex Kelly, the staff director for the House Redistricting Committee; Chris Clark, the chief legislative aide for Senator Gaetz; and attorneys for the Legislature. At a second meeting the following month, in January 2011, the consultants, met with Senator Gaetz, Representative Weather-ford, Alex Kelly, and Kelly’s Senate counterpart, John Guthrie.
These meetings were not open to the public and there is no record of what was discussed. As the trial court stated, “[n]o one who testified at trial about [the meetings] seemed to be able to remember much about what was discussed, though all seemed to agree that the political consultants were told that they would not have a ‘seat at the table’ in the redistricting process,” as they had during redistricting in years past. According to the trial court, “[n]o one clearly articulated what that meant exactly, but there was testimony that they were told that they could still participate in redistricting through the public process ‘just like any other citizen.’ ”
Reichelderfer, the consultant who has worked with then-Speaker Cannon, testi *380 fied that one topic of discussion at the meetings, as the trial court noted, was “whether a privilege could be identified to prevent disclosure of redistricting-related communications among political consultants, legislators, and legislative staff members.” The conclusion reached at the meetings, according to. the trial court, was “that no privilege would apply.” After the first meeting, in December 2010, Reichel-derfer prepared a memorandum that included the following question: “Communication with outside non-lawyers — how can we make that work?”
Another question included in the Rei-chelderfer memorandum was, “Evolution of maps — Should they start less compliant and evolve through the process — or— should the first map be as near as compliant as possible and change very little?” Reichelderfer acknowledged at trial that it was “possible” he discussed with Speaker Cannon the issues identified in this initial memo he prepared. The trial court would later reference Reichelderfer’s memo in rejecting part of the Legislature’s argument that there could be “no improper partisan intent in the drafting of the maps” because, the Legislature asserted, “as things progressed, each succeeding map that was drawn was an improvement over the one before it in terms of compactness, leaving cities and counties intact and following geographical boundaries.” “Coincidentally,” the trial court stated, “that corresponds with a strategy suggested from Reichelderfer’s notes, i.e., start with less compliant maps and work toward a more compliant map.”
The trial court found that there was “no reason to convene two meetings just to tell active political partisans of the Republican Party that they would not ‘have a seat at the table.’ ” The trial court also noted “a few curious things about these meetings and their connection to subsequent events that are troubling.”
Specifically, even though the consultants supposedly had no “seat at the table,” the trial court found that they continued to be involved in the process. In June 2011, an e-mail was sent from Senator Gaetz’s email address to legislators to provide information about upcoming public hearings regarding redistricting. A “blind copy” of this e-mail was sent to Heffley, the consultant under contract with the Republican Party of Florida, and to Terraferma, the “genius map drawer.” The trial court found that this was evidence that either Senator Gaetz or “someone in his office” was “keeping these operatives in the loop.”
Another e-mail, sent in October 2011 from Terraferma to Representative Weatherford, reported that Kirk Pepper, the Deputy Chief of Staff for then-Speaker Cannon, was “huddled on a computer” at the Republican Party of Florida’s headquarters, working with consultant Heffley on “[cjongressional redistricting if I had to guess?” Pepper acknowledged at trial that he must have been speaking with Heffley at the Republican Party of Florida’s headquarters at the time, but stated that he “never met with Rich Heffley about redistricting.” He had no explanation as to why Terraferma, whom Pepper had previously worked with at the Republican Party of Florida, would have thought otherwise. The trial court found that it was “possible that Terraferma was mistaken or simply speculating without .any basis,” but this communication caused the trial court to “wonder why [Terraferma] would make this assumption if Pepper really had nothing to do with the redistricting process.”
As it turned out, Pepper acted as a conduit between the consultants and the Legislature. According to testimony relied on by the trial court, Cannon staffer *381 Pepper “regularly” provided advance, nonpublic copies of draft redistricting maps to consultant Reichelderfer. The evidence, which came from document production by Reichelderfer since, as the trial court noted, neither Pepper nor Speaker Cannon preserved any records, demonstrated that between November 2011 and January 2012, Pepper transmitted to Reichelder-fer — through his personal e-mail account, a “Dropbox” account he later deleted, and a thumb drive — at least twenty-four draft congressional redistricting maps prepared by the Legislature, mostly before they were released to the public. In some instances, Pepper sent Reichelderfer maps the Legislature prepared but never released to the public.
Although Pepper testified at trial that he acted “without Speaker Cannon’s approval” and, in retrospect, considered his decision to provide Reichelderfer with maps to have been “a mistake,” Pepper was later hired by Cannon’s private firm after Cannon left office. Cannon described Pepper as “a loyal employee,” but testified that he did not know about Pepper’s transmission of maps to Reichelder-fer until it was reported in the media during the litigation in this case.
While they denied doing so, the trial court found that Pepper and Reichelderfer “communicatefd] about the political performance of the maps.” In one instance, after Reichelderfer expressed concerns that the draft of a Central Florida district occupied by incumbent Republican Representative Daniel Webster was “a bit messed up,” Pepper asked Reichelderfer, “[p]erformance or geography?” Reichel-derfer acknowledged during testimony at trial that “performance” in that context would “[generally” refer to the political performance of the district, although there is no record of his response to Pepper. Reichelderfer testified that he could not recall whether or how he answered that question. He spoke on the phone “regularly” with Pepper but denied having “specific conversations about political performance.”
Despite asking, “[p]erformance or geography?” Pepper testified at trial that he did not want to know from Reichelderfer if there was a problem with the political performance of that particular district. Instead, he provided a lengthy explanation that his question was a “sarcastic” response to remind Reichelderfer “to be quiet,” because they were not supposed to: talk about redistricting or the political implications of certain maps. Pepper stated of his question, “[fit’s like if you were talking to someone that you knew very well and had known for a long period of time, you could say something in writing that other people might take differently than you meant it.” The trial court discredited Pepper’s explanation as “very unusual and illogical.”
After receiving maps from Cannon staffer Pepper, Reichelderfer modified the maps to increase the Republican performance of the districts, and he and the other consultants traded numerous maps back and forth with each other. Of significance, the trial court found that some of Reichel-derfer’s modifications corresponded to the actual decisions the Legislature ultimately made.
In one graphic example, cited by the trial court, Reichelderfer’s revisions changed the performance of Districts 5, 7, 9, and 10 from four Democratic performing or leaning seats to two Democratic and two Republican performing seats, as eventually reflected in the actual map enacted by the Legislature. Another map, which was known to have been drawn by Terraf-erma, shared eleven identical districts with a map submitted through the public process by an individual named Alex Posada, *382 who denied ever creating or submitting the map and stated that he had not authorized anyone to submit a map using his name.
For his part, Reichelderfer described his interest in the Legislature’s maps as important to him “professionally” to “know the lay of the land,” similar to Bainter’s explanation that his interest was an “after-the-fact” one merely for the sake of his own “[k]nowledge” — even though the evidence presented at trial demonstrated that the consultants spent considerable time, including weekends, early mornings, and late nights, making revisions to draft maps, and even though communications between these consultants regarding the maps referred to having “a job to do,” wanting to “spread” the maps “around,” and “[h]ead[ing] up” to Tallahassee to “[t]ell[] folks to look at” certain maps.
The trial court found that the consultants “did their best to evade answering direct questions” at trial, “often using semantic distinctions to avoid admitting what they had done.” As this Court previously noted with respect to documents produced by Bainter that included communications among the consultants regarding maps,, “the documents supported] the challengers’ claim that Bainter was not just drawing maps out of casual ‘after-the-fact interest,’ but was actively engaged in an extensive process to draw maps favorable to a particular political party or incumbent and facilitate the submission of those maps to the Legislature through ‘shell people’ without any indication that the maps were drawn by the political consultants.” Apportionment VI, 150 So.3d at 1129. For instance, one email produced by Bainter stated that a Republican activist in Gainesville was “getting” him “10 more people at least,” while another e-mail indicated that if one of the consultants could “think of a more secure and failsafe way to engage our people, please do it.”
The trial court found that the Bainter documents “evidenced a conspiracy to influence and manipulate the Legislature into a violation of its constitutional duty” to redistrict in a neutral, non-partisan fashion, and explained that those documents were “very helpful” in demonstrating not only that the consultants “were submitting maps to the legislature” through third parties, but “how extensive and organized that effort was, and what lengths they went to in order to conceal what they were doing.” The trial court also found it “hard to imagine” that the legislative leaders and staffers who allegedly told these consultants that they could not be involved, other than through the public process, “would not have expected active participation in the public redistricting. process by those political consultants at the meetings” and would not have questioned both why the consultants were not in attendance at the public hearings and why none of the- maps coming from the public had any of' the consultants’ names on them. “I would think,” the trial court opined, “that the staff and legislative leaders would find [this lack of public participation by the consultants] extremely strange, that they might even ask why not. But they didn’t.”
According to the trial court, however, the consultants had no need to publicly participate in order to influence the Legislature’s redistricting plan. Throughout the process, Reichelderfer was in direct contact with Speaker Cannon. In one late November 2011 e-mail from Cannon to Reichelderfer, which copied Pepper, Cannon commented that “we are in fíne shape” as long as “the Senate accommodates the concerns that you [Reichelderfer] and Rich [Heffley] identified in the map that they put out tomorrow.”
Cannon testified at trial that these “concerns” he was referring to were that the *383 House and Senate “not roll out maps that were either completely inconsistent with one another or designed to show some inadequacy in terms of either minority representation or defect in [the House’s] maps,” so that reconciliation between the two chambers would be difficult. The trial court found Cannon’s explanation to be “a stretch given the language used.”
The evidence also revealed that Cannon asked Reichelderfer and Heffley, who was described as being “close” to Senator Gaetz, to serve, as the trial court put it, “as go betweens for leadership of the two chambers regarding the redistricting process.” According to testimony relied on by the trial court, the asserted reason for Reichelderfer’s and Heffley’s involvement was “purportedly because of a lack of a good working relationship between the Speaker of the House and the President of the Senate.”
The trial court was skeptical of that explanation, however, stating that “by all accounts, the actual staff members of each chamber who were working on the maps got along well with each other, as did the chairmen of the redistricting committees.” The trial court actually found the staff members who testified at trial to be “straightforward and credible” and “not a part of the conspiracy.” In any event, the trial court specifically found that “in their insider roles, Heffley and Reichelderfer did not have to speak directly to staff map drawers, or even leadership, to infect and manipulate the map drawing and adoption process.”
At trial, Reichelderfer admitted to discussing “global” redistricting concerns with Speaker Cannon, but denied talking to Cannon “specifically about individual maps.” Reichelderfer lived near Cannon, their families spent time together, Reichel-derfer saw Cannon on the weekends, and Reichelderfer met with Cannon to discuss issues he was dealing with as Speaker.
Reichelderfer also correctly informed other consultants about which of the Legislature’s draft maps was most “relevant,” meaning which was most likely to advance in the process. Among the seven congressional- maps released to the public by the House on December 6, 2011, the map identified by Reichelderfer as the map most likely to advance was the map that was revised to become the House’s final proposed congressional map. At trial, Rei-chelderfer could not “recall specifically” how he knew that map to be the most likely to advance in the process, simply stating that if he “had that information for sure,” he wouldn’t have used the qualifier “I think” in his response. He testified that he “could have” just thought it “was the easiest to pair up with the Senate version of the map.”
Communications among the consultants revealed particular emphasis on certain areas of the map. For instance, in one email referencing a configuration in a draft map that kept District 14 contained entirely within Hillsborough County — a configuration less favorable to Republicans than the configuration ultimately enacted, which crossed Tampa Bay to pick up voters from Pinellas County in District 14 — Terrafer-ma noted to Heffley that “Tampa is far from perfect.” The enacted configuration of Districts 13 and 14 — where District 14 includes a portion of Pinellas County, rather than being strictly within Hillsbor-ough — produced one safe Democratic seat and one seat that either party could win, rather than two naturally-occurring seats favorable to Democrats. This was the configuration preferred by the consultants.
In another e-mail between Terraferma, Heffley, and Reichelderfer sent on the same day the Senate released a public map that did not divide the City of Home *384 stead — a division considered by the consultants to be important , to favor Republicans — Terraferma noted that District 26 was “pretty weak.” Heffley responded, “The [H]ouse needs to fix a few of these,” and Terraferma, copying Reichelderfer, responded, “yes.” The enacted configuration did, indeed, split the City of Homestead between Districts 26 and 27, which turned one Republican district and. one Democratic district into two Republican-leaning districts.
The decision to split Homestead was one of several key decisions made in a nonpublic meeting between Senator Gaetz, Representative Weatherford, and the two staff directors of the respective redistricting committees. While the meeting of two legislators in private does not result in a violation of article III, section 4(e), of the Florida Constitution — which requires all meetings between “more than two members” of the Legislature to be open to the public — the lengths to which the legislators went to avoid triggering the requirements for a- public meeting in the final stages of negotiating and making changes to the districts raises questions as to the motivation of the Republican leadership. It also stands in stark contrast to statements from that leadership proclaiming that the 2012 redistricting process would be the most open and transparent in Florida’s history. And, it can be readily distinguished from other legislative decisions where private negotiations are undertaken, since redistricting involves “a constitutional restraint on the Legislature’s actions.” Apportionment IV, 132 So.3d at 147.
Indeed, many final revisions that affected numerous districts in some way — such as the decision to push the Black Voting Age Population (BVAP) of District 5 over 50%, add an appendage to District 10, split Homestead, and increase the Hispanic Voting Age Population (HVAP) of Districts 9 and 14 — were made in this non-public meeting that occurred after the House and Senate had each passed their versions of the congressional map. The decisions regarding District 5 and District 10 specifically contributed to the trial court’s decision to invalidate those two districts.
There was, in general, either conflicting or vague testimony as to why certain decisions were made in this meeting, including that the decisions were necessary to comply with the federal Voting Rights Act or some other policy concern. Because the meeting was not public, however, there is no official record of the reason for these decisions, which ultimately benefitted the Republican Party.
One example of a key decision made during this non-public meeting was the decision to push the BVAP of District 5 over 50%. Although he could not recall specifics, Representative Weatherford testified that making District 5 a majority-minority district was “important to the Senate” and that the Senate made a “compelling case” for raising the BVAP of the district over 50%. The highest BVAP for District 5 in any of the House’s draft maps was slightly over 48%. Senator Gaetz testified that the Senate believed it was important to increase the BVAP to over 50% to protect against a federal Voting Rights Act challenge, and that he also favored keeping the City of Sanford in the district, which the House’s version of the map did not do.
Before Representative Weatherford met with Senator Gaetz, Speaker Cannon met separately with Representative Weather-ford and staff in another non-public meeting. Speaker Cannon anticipated that the Senate would ask to make District 5 a majority-minority district and apparently instructed the House during this non-public meeting to agree to the Senate’s request. Ensuring that the BVAP of Dis *385 trict 5 ended up over 50% was of particular concern to Reichelderfer, the consultant who was part of Speaker Cannon’s “inner circle.”
At trial, Reichelderfer testified, without specificity, that he believed pushing the BVAP of District 5 over 50% was important “to comply with the Federal Voters Rights Act,” based on a general recollection of discussions with lawyers whose names he could not recall. He thought it would be “politically damaging” if the map was invalidated because of a successful Voting Rights Act challenge, even though the 2002 version of District 5 did not have a BVAP of over 50% and was not invalidated during Voting Rights Act litigation. See Martinez, 234 F.Supp.2d at 1307 (noting that the BVAP of the 2002 version of District 5 was “only” 46.9%, but that the district “will afford black voters a reasonable opportunity to elect candidates of choice and probably will in fact perform for black candidates of choice”). At the same time, increasing the BVAP of District 5 — as occurred from early versions of the Legislature’s draft maps to the enacted version — decreased the Democratic performance of surrounding districts.
The trial court found the Legislature’s justification for making District 5 a majority-minority district to be “not compelling” and invalidated the enacted version of District 5. The Legislature’s decision — made in a non-public meeting, after Cannon’s instruction in a separate non-public meeting, consistent with a concern Reichelder-fer had long expressed — is therefore circumstantial evidence of collusion between the Legislature and the consultants, particularly where the trial court found there to have been no showing that it was legally necessary to create a majority-minority district.
There is no record from the time many of these key decisions were made to explain the Legislature’s reasoning. This is, of course, partly because the final decisions were made in a non-public meeting. But it is also because the Legislature, as the trial court found, deleted almost all emails and documentation related to redistricting.
Former Speaker Cannon testified that his e-mails were automatically deleted after six months unless specifically saved as having “significant archival or legal significance.” If that were the case, then exchanges between Speaker Cannon and consultant Reichelderfer that occurred in late November 2011 — discovered from document production by Reichelderfer — would not have been deleted until May 2012 unless they were intentionally deleted before that time. But May 2012 was several months after the lawsuit was filed in this case, naming Cannon as a party and making a reality what the Legislature itself had previously acknowledged, as far back as December 2012, to have been “a moral certainty” from “start to finish” during the redistricting process — that records related to redistricting would be sought by the challengers and relevant to adjudicating the constitutionality of the Legislature’s redistricting plan.
Ultimately, based on the evidence the challengers uncovered and presented at trial, the trial court found that there was “just too much circumstantial evidence” and “too many coincidences” to reach any conclusion other than that the political operatives had “infiltrate[d] and influence[d] the Legislature” in order to “obtain the necessary cooperation and collaboration” to “taint the redistricting process and the resulting map with improper partisan intent.” While it is sometimes said that it is “hard to believe in coincidence,” the trial court determined in this case that, as the saying goes, it was “even harder to believe in anything else.” After reviewing all the *386 evidence, both direct and circumstantial, the trial court thus concluded that the plan was drawn with improper partisan intent.
C. STEPS AFTER FINDING UNCONSTITUTIONAL INTENT
Despite its finding of unconstitutional partisan intent, however, the trial court invalidated only Districts 5 and 10, rejecting challenges to seven other individual districts. The trial court determined that there was no “distinction” between a challenge to the plan as a whole and a challenge to specific districts, and therefore “focused on those portions of the map” that it found to be “in need of corrective action in order to bring the entire plan into compliance with the constitution.”
Its finding of unconstitutional intent notwithstanding, the trial court applied a deferential standard of review in analyzing each challenged district, “deferring to the Legislature’s decision to draw a district in a certain way, so long as that decision does not violate the constitutional requirements.” Believing that the “more reliable” indicators of whether the plan was drawn with the intent to favor a political party or incumbent were the tier-two constitutional measures, the trial court “first examine[d] the map for apparent failure to comply with tier-two requirements of compactness and utilization of political and geographical boundaries where feasible, then consider[ed] any additional evidence that supports the inference that such districts are also in violation of tier-one requirements.”
Applying this analysis as to District 5, the trial court noted that the decision to increase the BVAP of District 5 over 50% was made at a non-public meeting at the end of the redistricting process and ultimately found that there was no showing “that it was legally necessary to create a majority-minority district.” The trial court therefore concluded that the challengers had proved “that District 5 unnecessarily subjugates tier-two principles of compactness” and that “portions of District 5 were drawn to benefit the Republican Party, in violation of tier-one.” .
As to District 10, the trial court noted an “odd-shaped appendage” and found that the challengers had “shown that the district could be drawn in a more compact fashion, avoiding this appendage.” The trial court therefore concluded, based in part on an inference it drew from the existence of the odd-shaped appendage that had no legal justification, that District 10 was drawn to benefit the Republican Party and the incumbent.
Accordingly, the trial court required Districts 5, 10, and “any other districts affected thereby” to be redrawn. But the trial court rejected the challenges to Districts 13,14, 21, 22, 25, 26, and 27, concluding that the challengers had not met their burden to demonstrate unconstitutionality and had not shown more than “de minim-is” tier-two violations.
As a remedy, the challengers urged the trial court to adopt one of their remedial plans, draw its own remedial plan, or hire an independent expert to draw a remedial plan. After a hearing, the trial court declined the challengers’ suggestions and determined that the Legislature should redraw the plan.
The Legislature held a special session in August 2014 to enact a remedial redistricting plan. During this session, the chairs of the respective redistricting committees again conducted non-public meetings with staff and counsel to negotiate the features of the revised plan. The Legislature made modest changes to correct the specific tier-two deficiencies identified in Districts 5 and 10,[8] and, after the plan was signed into *387 law, the trial court held another hearing to consider the validity of the revised plan and whether it could be implemented in time for the 2014 elections.
Concluding that the challengers’ objections to the validity of the remedial plan were without merit, the trial court approved the Legislature’s remedial redistricting plan and ordered the then-impending 2014 elections to proceed under the unconstitutional 2012 plan due to time constraints, with the remedial plan to take effect for the 2016 elections. The 2016 effective date for the remedial plan has not been challenged.
The challengers appealed the trial court’s initial order containing its factual findings and legal conclusions, as well as its subsequent order approving the remedial redistricting plan, and the Legislature cross-appealed, attacking certain aspects of the trial court’s judgment but ultimately seeking affirmance of the order approving the remedial plan. The First District Court of Appeal then certified the trial court’s judgment for direct review by this Court. See League of Women Voters of Fla. v. Detzner, No. 1D14-8953, — So.3d —, —, 2014 WL 4851707, at *2 (Fla. 1st DCA Oct. 1, 2014). We accepted jurisdiction under article V, section 3(b)(5), of the Florida Constitution, and heard oral argument. See League of Women Voters of Fla. v. Detzner, No. SC14-1905, 2014 WL 5502409, at *1 (Fla.Sup.Ct. order filed Oct. 23, 2014).
III. ISSUES OF “INTENT”
Having set forth this comprehensive background, we now turn to the legal issues pertaining to the trial court’s finding of unconstitutional intent. First, we consider the “intent” standard itself and whether the trial court correctly applied the standard in this case. Then, we review the legal sufficiency of the trial court’s finding.
A. THE “INTENT” STANDARD
Article III, section 20, of the Florida Constitution, prohibits an apportionment plan or individual district from being “drawn” with the “intent to favor or disfavor a political party or an incumbent.” Art. Ill, § 20(a), Fla. Const. All parties in the litigation, the trial court stated, “agreed that it is the Legislature’s intent” — not the intent of, for instance, one rogue “staff member charged with actually drawing the map,” or of political consultants with no influence on the Legislature — “that is at issue.” But how to determine the Legislature’s intent in this unique context, where the Florida Constitution contains an explicit prohibition on certain improper legislative intent in “draw[ing]” the redistricting plan, is a much more difficult proposition.
In Apportionment I, 83 So.3d at 617, this Court explained that “the Florida Constitution prohibits drawing a plan or district with the intent to favor or disfavor a political party or incumbent.” (Emphasis supplied.) There is, this Court held, “no acceptable level of improper intent.” Id. The “intent” standard “applies to both the apportionment plan as a whole and to each district individually.” Id. (emphasis supplied). This Court’s precedent discussing the “intent” standard in the course of prior cases during this litigation has demonstrated this principle — that improper intent, particularly if “part of a broader process to develop portions of the map,” may “directly relate to whether the plan as a *388 whole or any specific districts were drawn with unconstitutional intent.” Apportionment IV, 132 So.3d at 150 (emphasis supplied).
In a traditional lawsuit involving a challenge to a statutory enactment, courts determine legislative intent through statutory construction, looking to the actual language used and any other tools—such as the history of legislative changes and any appropriate interpretive canons—to assist in discerning the Legislature’s intent in enacting the law. See, e.g., Heart of Adoptions, Inc. v. J.A., 963 So.2d 189, 198-99 (Fla.2007) (setting forth the general principle of statutory interpretation that “legislative intent is determined primarily from the statute’s text” and applying rules of statutory construction “to determine the legislative intent behind the provision,” including reading related statutory provisions together to achieve a consistent whole and avoiding readings that would render part of a statute meaningless). As this Court has previously explained, however, determining whether the Legislature acted with the type of improper “intent” that is prohibited by the “specific constitutional mandate of article III, section 20(a), is entirely different than a traditional lawsuit that seeks to determine legislative intent through statutory construction.” Apportionment IV, 132 So.3d at 150.
Specifically, this Court held in largely rejecting claims of legislative privilege in Apportionment IV that, because the decision-making process itself is the case, “the communications of individual legislators or legislative staff members, if part of a broader process to develop portions of the map, could directly relate to whether the plan as a whole or any specific districts were drawn with unconstitutional intent.” Id. This Court further stated that the “existence of a separate process to draw the maps with the intent to favor or disfavor a political party or an incumbent is precisely what the Florida Constitution now prohibits,” and that evidence of this separate process would “clearly” be “important” to help support a “claim that the Legislature thwarted the constitutional mandate.” Id. at 149.
Following this Court’s precedent, which “emphasize[s] that this case is wholly unlike the traditional lawsuit challenging a statutory enactment,” id. at 151, the trial court framed the “intent” inquiry as determining “the motive in drawing” the districts. We agree that this was the correct approach. Under this framework, the trial court appropriately concluded that “the actions and statements of legislators and staff, especially those directly involved in the map drawing process!,] would be relevant on the issue of intent.”
Case law supports the trial court’s conclusion, which is consistent with our decision in Apportionment IV, that the intent of individual legislators and legislative staff members involved in the drawing of the redistricting plan is relevant in evaluating legislative intent. The United States Supreme Court, for example, has recognized that the actions of individual legislators and staff members may be relevant in discerning legislative intent in the context of redistricting.
In Easley v. Cromartie, 532 U.S. 234, 254, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001), the Supreme Court reviewed “direct” evidence, relied on by a federal district court evaluating a claim of racial predominance in North Carolina’s congressional redistricting plan, involving an e-mail sent from “a legislative staff member responsible for drafting districting plans” to two state. senators. The Supreme Court noted that the e-mail’s “reference to race” offered “some support” for the district court’s conclusion that the *389 North Carolina Legislature used race as the “predominant factor” in drawing the boundaries of a particular district. Id,.; see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 267, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (stating that the “specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker’s purposes” and that “[departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role”).
Other redistricting cases have confirmed this principle. In Texas v. United States, 887 F.Supp.2d 133, 165 (D.D.C.2012),[9] cited by the trial court, a three-judge federal district court panel stated that its “skepticism about the legislative process that created [a challenged district] [wa]s further fueled by an email sent between staff members on the eve of the Senate Redistricting Committee’s markup of the proposed map.” See also Smith v. Beasley, 946 F.Supp. 1174, 1210 (D.S.C.1996) (stating that “the evidence [wa]s clear that the Reapportionment Subcommittee delegated to its staff ... the responsibility of drawing the district lines,” and subsequently evaluating the actions of those staff members). In other words, the federal district court looked to the actions of legislative staff members directly involved in the redistricting process to assist in evaluating whether the Legislature was acting with improper intent. Whether the actions of individual legislators or staffers ultimately signify constitutionally improper intent— as the trial court concluded in this case, despite finding the professional staff to be credible — is a separate question from whether their intent is relevant, in the first place, to evaluating the intent of the Legislature in drawing the redistricting plan.
In support of its contrary argument that “[ejourts across the country ... refuse to impute the personal motivations of individual legislators to the legislative body as a collective whole,” the Legislature offers a catalogue of citations to cases from other jurisdictions. But, as the challengers have pointed out, these cases and the arguments made by the Legislature in this case closely mirror the exact cases and arguments this Court distinguished and rejected for the same basic principle in Apportionment IV.
In that case, this Court specifically stated that “this case is completely distinguishable from the various circuit court orders and cases outside the reapportionment context from other jurisdictions cited by the Legislature that have quashed subpoenas of legislators or legislative staff members where the testimony of an individual member of the Legislature was not directly relevant to any issue in the case.” Apportionment IV, 132 So.3d at 150. Indeed, in Apportionment IV, we determined that the actions of the individual legislators and legislative staff members involved in the drawing of the redistricting plan were directly relevant to assessing whether the plan itself was drawn with improper intent. See id. at 137 (“[T]he issue presented to the Court is whether Florida state legislators and legislative staff members have an absolute privilege, against testifying as to issues directly relevant to whether the Legislature drew the 2012 congressional apportionment plan with unconstitutional partisan or discriminatory ‘intent.’ ”).
*390 Accordingly, we hold that the trial court correctly framed the “intent” inquiry and reject the Legislature’s assertion that the finding of unconstitutional intent could not be ascribed to the Legislature as a whole. Having reached the conclusion that the trial court did not err in evaluating the actions of legislators and legislative staff members in finding unconstitutional “intent,” as prohibited by article III, section 20, we turn next to the legal sufficiency of the trial court’s finding.
B. LEGAL SUFFICIENCY OF UNCONSTITUTIONAL INTENT
Our review of the trial court’s finding of unconstitutional intent in the congressional redistricting plan takes place against the backdrop of the trial court’s specific finding that the Legislature “systematically deleted almost all of their emails and other documentation relating to redistricting.” The Legislature did so despite knowledge that litigation over the constitutionality of its redistricting plan was inevitable.
In fact, as far back as 2008, the Legislature argued to this Court that “litigation challenging reapportionment under the new standards” would increase as a result of the Fair Districts Amendment. See Advisory Op. to Att’y Gen. re Standards for Establishing Legislative Dist. Boundaries, 2 So.3d 161, 165 (Fla.2009). And, the Legislature informed the trial court in this case that litigation “was ‘imminent’ long before the days preceding the filing of’ the challengers’ lawsuit. From “start to finish,” the Legislature asserted, the 2012 redistricting process, “more than any other, was conducted in an atmosphere charged with litigation.”
To be sure, the Legislature did preserve some records related to redistricting — documents showing, for instance, the time and location of public meetings or other generally benign details of the process. But the Legislature saved virtually no communications among legislators and staff and none of the communications — which, as a result of this case, we now know to have occurred — involving the outside political consultants.
The Legislature had no specific policy requiring it to preserve communications regarding redistricting, even though it knew litigation was certain to occur, and admits that its record-retention policies applied in the same manner to redistricting as they applied to all types of legislative business. The House’s policy, for example, specified that “records that are no longer needed for any purpose and that do not have sufficient administrative, legal, or fiscal significance to warrant their retention shall be disposed of systematically.” Fla. H.R. Rule 14.2(b) (2010-2012).
To the extent the Legislature argues that it had no reason to know it needed to preserve these records because it could not have anticipated this Court’s decision in Apportionment IV rejecting its broad claim of legislative privilege over communications related to redistricting, the Legislature had, according to testimony at trial, determined as early as January 2011 that no privilege would apply to any of its communications with outside political consultants. In other words, the Legislature clearly knew that communications between, for instance, Speaker Cannon and consultant Reichelderfer would not be privileged, that they would be sought in litigation, and that litigation was certain to occur. Yet, Speaker Cannon did not preserve these records — and the only reason we now know these communications occurred is because records were produced during the litigation by Reichelderfer. The same is true of non-public draft redistricting maps sent to Reichelderfer by leg *391 islative staffer Kirk Pepper, using a personal e-mail account and a since-deleted “Dropboix” account.
The trial court stated that there was “no legal duty on the part of the Legislature to preserve these records, but you have to wonder why they didn’t,” given that litigation was certain to occur. Although the Legislature’s failure to preserve records apparently did not violate a specific rule of legislative procedure regarding records retention — even though at least some of these records likely did have sufficient legal significance to have warranted their retention — Florida courts have, in any event, found a duty to preserve evidence in other circumstances when a party should reasonably foresee litigation. See Am. Hospitality Mgmt. Co. of Minn. v. Hettiger, 904 .So.2d 547, 549 (Fla. 4th DCA 2005) (noting holdings that “a defendant could be charged with a duty to preserve evidence where it could reasonably have foreseen the claim”). And this Court, in rejecting the Legislature’s broad claim of legislative privilege in Apportionment IV, clearly held that the “purpose behind the voters’ enactment of the article III, section 20(a), standards will be undermined” if “the Legislature alone is responsible for determining what aspects of the reapportionment process are shielded from discovery.” 132 So.3d at 149.
Even in the absence of a legal duty, though, the spoliation of evidence results in an adverse inference against the party that discarded or destroyed the evidence. As this Court explained in Martino v. Wal-Mart Stores, Inc., 908 So.2d 342, 346 (Fla.2005), Florida courts may impose sanctions, including striking pleadings, against a party that intentionally lost, misplaced, or destroyed evidence, and a jury could infer under such circumstances that the evidence, would have contained indications of liability. If the evidence was negligently destroyed, a rebuttable presumption of liability may arise. Id. at 347. In other words, as recognized by the Fourth District Court of Appeal, “an adverse inference may arise in any situation where potentially self-damaging evidence is in the possession of a party and that party either loses or destroys the evidence.” Golden Yachts, Inc. v. Hall, 920 So.2d 777, 781 (Fla. 4th DCA 2006) (quoting Martino v. Wal-Mart Stores, Inc., 835 So.2d 1251, 1257 (Fla. 4th DCA 2003), approved, 908 So.2d 342);. see also Nationwide Lift Trucks, Inc. v. Smith, 832 So.2d 824, 826 (Fla. 4th DCA 2002) (stating that “[c]ases in which evidence has been destroyed, either inadvertently or intentionally, are discovery violations” that may be subject to sanctions).
The trial court was, therefore, justified in drawing an adverse inference against the Legislature in adjudicating the challengers’ claim of unconstitutional partisan intent. And we' too must consider the Legislature’s “systematic[ ] deletion]” of redistricting records in evaluating whether the trial court’s finding is supported by competent, substantial evidence.
Turning to the merits of the trial court’s finding, we have little trouble concluding that competent, substantial evidence of unconstitutional intent exists in the record. The Legislature asserts that the trial court did not find improper intent in the plan as a whole and, in particular, contends that there was no collaboration between partisan operatives and the Legislature in drawing the congressional redistricting plan. While acknowledging that partisan operatives “sought to influence the redistricting process,” the Legislature states that “at no time did the Legislature participate in their efforts.” If features from the operative-created maps made it into the enacted map, the Legislature says, it is simply because those' fea *392 tures were obvious or the similarities “superficial,” and not because the operatives’ “frenetic efforts to make themselves relevant” were successful. In other words, the Legislature argues that it “did not conspire with the operatives, despite the operatives’ efforts.”
We reject the Legislature’s attempt to water down the trial court’s findings and the inferences the trial court drew from the circumstantial evidence presented by pointing to an alleged lack of connection between the “parallel” process and the Legislature. The trial court found that it was “convince[d]” by the “circumstantial evidence introduced at trial” that the political operatives “obtain[ed] the necessary cooperation and collaboration” from the Legislature to ensure that the “redistricting process and the resulting map” were “taint[ed]” with “improper partisan intent.” Indeed, the trial court specifically found that the operatives “were successful in their efforts to influence the redistricting process and the congressional plan under review.”
Nevertheless, the Legislature asserts that any conclusion that the whole plan was motivated by partisan intent “assumes the complicity of professional staff,” which is an “assumption” it claims the trial court rejected. While the trial court did find the professional staff to be “credible” and not to have been “part of the conspiracy,” the trial court immediately dismissed the Legislature’s argument about the effect of the staff having been insulated from the improper intent — which it called the “most compelling evidence in support” of the Legislature’s defense — by stating that the “political operatives managed to find other avenues, other ways to infiltrate and influence the Legislature, to obtain the necessary cooperation and collaboration” to “taint the redistricting process and the resulting map with improper partisan intent.” And while the trial court made no explicit credibility determinations regarding any of the legislators who testified, the trial court did specifically reject the innocuous explanations provided by former Speaker Cannon and his staffer, Pepper, for their communications with the political consultants.
There is also no doubt that the trial court’s finding of unconstitutional intent pertained to the “process” of redistricting and the^ “enacted map” as a whole — to use the trial court’s own words — rather than solely to the two specifically invalidated districts as the Legislature contends. In finding “too much circumstantial evidence” to reach any conclusion other than that the “redistricting process” and the “resulting map” were “taint[ed]” by “improper partisan intent,” the trial court pointed specifically to the following evidence: the Legislature’s destruction of “almost all” e-mails and “other documentation relating to redistricting”; early meetings between legislative leaders and staff with political consultants regarding the “redistricting process”; and the “continued involvement” of political consultants in the “redistricting process.” None of this evidence relied on by the trial court was district-specific. The dissent’s contrary interpretation of the trial court’s finding of unconstitutional intent renders meaningless the trial court’s extensive discussion of — and critical findings related to — this evidence.
We also reject the Legislature’s suggestion that the trial court’s determination, in its order approving the remedial redistricting plan, that the Legislature had corrected the identified deficiencies in the map is dispositive in evaluating the scope of its 'finding of unconstitutional intent. Instead, as detailed in the next sections, the trial court’s decision to approve the Legislature’s remedial redistricting plan flowed *393 from the legal errors made in its original judgment.
Accordingly, for all these reasons, we affirm the trial court’s finding of unconstitutional intent. We turn next to the trial court’s two legal errors, which significantly affected its determination of the proper effect of its finding that the Legislature violated the Florida Constitution.
IV. TRIAL COURT’S FIRST LEGAL ERROR: FAILING TO PROPERLY ANALYZE THE CHALLENGE TO THE PLAN “AS A WHOLE”
The first legal error committed by the trial court was its determination that there was no distinction between a challenge to the redistricting plan “as a whole” and a challenge to individual districts. This error led to the trial court’s failure to give any independent legal significance to its finding of unconstitutional intent when examining the challenges to individual districts.
Specifically, the evidence presented and considered by the trial court — evidence that actually led the trial court to find the existence of constitutionally improper partisan intent — included evidence pertaining both to the plan “as a whole” and to “specific districts.” Indeed, the trial court explicitly noted this, stating that “[o]ne of [the challengers’] claims is that the entire redistricting process was infected by improper intent.” (Emphasis supplied.)
Yet, despite its findings that partisan political consultants had “made a mockery” of the process and “managed to taint the redistricting process and the resulting map with improper partisan intent,” the trial court rejected the challengers’ distinction between their challenge to improper intent in the redistricting plan “as a whole” — a challenge, in effect, to the map that was produced from the process — and their challenge to “individual districts,” stating as follows:
[The challengers] distinguish between their challenge to the redistricting plan as a whole, as being drawn with the intent generally to favor the Republican Party, and their challenge to several individual districts, as being specifically drawn with such intent. I find this to be a false dichotomy, a distinction without difference. The redistricting plan is the result of a single act of legislation. If one or more districts do not meet constitutional muster, then the entire act is unconstitutional. The districts are part of an integrated indivisible whole. So in that sense, if there is a problem with a part of the map, there is a problem with the entire plan. [FN 5]

That does not mean, however, that portions of the map not affected by those individual districts found to be improperly drawn would need to be changed in a redrawn map, even if a general intent to favor or disfavor a political party or incumbents was proven. What would be the point if the other districts are otherwise in compliance? Such a remedy would go far beyond correcting the effect of such noncompliance, but rather would require a useless act that would encourage continued litigation. Therefore, I have focused on those portions of the map that I find are in need of corrective action in order to bring the entire plan into compliance with the constitution.

(Emphasis supplied.)
The dissent asserts that “[a]t no point does the trial court indicate that it would *394 permit some level of unconstitutional intent in the drawing of any district.” Dissenting op. at 419. But the trial court specifically concluded that districts could be “in compliance” with the constitutional standards “even if a general intent to favor or disfavor a political party or incumbents was proven.” -This statement clearly indicates that the trial court considered a general improper intent to lack any independent legal significance unless it was accompanied by another constitutional violation, which is an interpretation that simply does not square with the Florida Constitution or this Court’s precedent.
This Court has held that “the Florida Constitution prohibits drawing a plan” with improper intent. Apportionment I, 83 So.3d at 617. This Court has also held that “there is no acceptable level of improper intent.” Id. And, this Court has held that the “intent” standard “applies to ... the apportionment plan as a whole.” Id. Accordingly, under these holdings, the trial court’s “general” finding of improper intent in the “process” must have some independent legal significance.
The trial court, however, failed to give effect to that finding of improper intent, in part because it never separately considered the challenge to the plan as a whole and, critically, never gave any weight to the general improper intent in analyzing the individual district challenges. The challengers correctly note that the trial court’s finding of improper intent was based extensively on the existence of a “different, separate process that was undertaken contrary to the [Legislature’s public] transparent [redistricting] effort in an attempt to favor a political party or an incumbent.” Apportionment TV, 132 So.3d at 149. And, as this Court stated in Apportionment IV, the existence of such a “parallel” process is “important evidence in support of the claim that the Legislature thwarted the constitutional mandate.” Id.
In error, the trial court gave no legal weight to the existence of this separate process. The trial court’s decision to invalidate District 5 was supported by numerous factors distinct from the “parallel” process, including that the district as enacted was “not compact,” was “bizarrely shaped,” and did not “follow traditional political boundaries as it winds from Jacksonville to Orlando,” narrowing at one point to the width of a highway. The trial court found improper intent to benefit the Republican Party as to District 5 based on “the decision to increase the district to majority BVAP, which was accomplished in large part by creating [a] finger-like appendage jutting into District 7.” Then, the trial court simply “buttressed” this “inference” of improper intent, based on the existence of the “oddly shaped appendage[ ],” through “the evidence of improper intent in the redistricting process generally, and as specifically related to the drawing of District 5,” but did not independently rely on the “general” improper intent in any legally significant way.
In other words, aside from referencing the increase in the BVAP of District 5 over 50% during a non-public meeting at the end of the redistricting process, the trial court’s decision to invalidate District 5 was based solely on blatant tier-two violations. While this Court had to resort to evaluating tier-two violations as a means to infer improper intent when considering the challenges to the Senate and House maps in Apportionment I, as we emphasized at that time, we were constrained because we had no factual record and no direct evidence of improper intent. Exactly the opposite was true in this case.
The trial court’s decision to invalidate District 10 is analogous. Noting an “odd-shaped appendage which wraps under and *395 around District 5, running between District 5 and 9,” the trial court stated that the challengers had “shown that the district could be drawn in a more compact fashion, avoiding this appendage.” The trial court’s conclusion that District 10 “was drawn to benefit the Republican Party and the incumbent” was “based in part on the inference that the Florida Supreme Court suggested [in Apportionment I] could be drawn from oddly shaped appendages that had no legal justification” — an “inference” that, as with District 5, was simply “buttressed by the general evidence of improper intent” in the process and by objective indicators relied on by this Court in Apportionment I.
In rejecting challenges to seven other individual districts, the trial court never referred to the “general evidence of improper intent” that it found to exist in the “process.” Rejecting the challenge to Districts 13 and 14, in the Tampa Bay area, the trial court stated that, “[ujnlike Districts 5 and 10, there are no flagrant tier-two deviations” from which the trial court could “infer” improper intent. “[U]nlike changes made to District 5 by the [legislative] leaders during conference committee” — the “evidence of partisan intent specifically related to District 5,” where the House agreed with the Senate’s request to push the BVAP over 50% — the trial court determined that it could not conclude, “on partisan effect alone,” that certain decisions were made in drawing Districts 13 and 14 “with the intent to benefit the Republican Party or the incumbent member of Congress.”
Likewise rejecting the challenge to Districts 21 and 22, the trial court concluded that the challengers had “not met their burden of showing unnecessary deviation from tier-two requirements,” nor had they “shown that improper intent led to the adoption of Districts 21 and 22.” Similarly, with respect to Districts 25, 26, and 27, the trial court determined that the challengers had “not proved invalidity” because the “totality of the evidence” did not establish that the “configuration” of these districts “was based on unlawful partisan intent.” At no point in addressing the validity of any of these districts — in which the trial court rejected the challengers’ contention that the districts were drawn with improper partisan intent — did the trial court address any effect of its findings regarding how the “process” had been “taint[ed]” with “improper partisan intent.”
In determining that there was no distinction between a challenge to the “whole map” and a challenge to individual districts, the trial court relied on this Court’s prior decision to invalidate the entire state Senate plan in Apportionment I. Citing this Court’s decision as support, the trial court stated that this Court “invalidated the entire Senate plan but gave specific instructions as to which districts required corrective action.”
The trial court was correct that this Court invalidated the whole Senate plan, to the extent that it determined the plan did “not pass constitutional muster” for the purposes of this Court’s article III, section 16, declaratory judgment review. Apportionment I, 83 So.3d at 683. But, unlike here, this Court in Apportionment I did not find a general improper intent in the state Senate plan, aside from the district numbering system that was manipulated to favor incumbents. Nor could we have, based on the nature of the limited record before us.
In Apportionment I, we expressed our conclusion regarding the Senate plan as follows:
We have held that Senate Districts 1, 3, 6, 9, 10, 29, 30, and 34 are constitutionally invalid. The Legislature should *396 remedy the constitutional problems with respect to these districts, redrawing these districts and any affected districts in accordance with the standards as defined by this Court, and should conduct the appropriate functional analysis to ensure compliance with the Florida minority voting protection provision as well as the tier-two standards of equal population, compactness, and utilization of existing political and geographical boundaries. As to the City of Lakeland, the Legislature should determine whether it is feasible to utilize the municipal boundaries of Lakeland after applying the standards as defined by this Court. In redrawing the apportionment plan, the Legislature is by no means required to adopt the Coalition’s alternative Senate plan. Finally, we have held that the numbering scheme of the Senate plan is invalid. Accordingly, the Legislature should renumber the districts in an incumbent-neutral manner.
Id. at 686.
In other words, this Court identified very specific deficiencies in the Senate plan — eight individual districts that were invalid, the failure to conduct a functional analysis, and the district numbering scheme. This Court did not conclude that the whole plan was unconstitutional because of improper intent in the whole plan, and this Court did not analyze — and could not have analyzed — the plan in that manner. Therefore, in relying on Apportionment I in this way, the trial court failed to give any actual effect to its finding in this case that the “whole plan” challenge had been proven through the direct and circumstantial evidence of improper partisan intent presented at trial.
Accordingly, for all these reasons, we conclude that the trial court erred in failing to recognize any distinction between a challenge to the redistricting plan “as a whole” and a challenge to individual districts. This error significantly affected the trial court’s determination of the proper scope and legal effect of its finding of unconstitutional intent, particularly with regard to its analysis of the challenges to individual districts, and ultimately contributed to its decision to approve a remedy that was effectively no different than the remedy if there had been no finding of unconstitutional intent.
V. TRIAL COURT’S SECOND LEGAL ERROR: APPLYING A DEFERENTIAL STANDARD OF REVIEW
The trial court’s error in failing to properly analyze the challenge to the plan “as a whole” was compounded by its error in the deferential standard of review it applied after finding the existence of unconstitutional intent. Certainly, we recognize the difficult task the trial court faced, considering numerous issues of first impression and attempting to be faithful to this Court’s redistricting decisions. And we commend the trial court for the superb and professional manner in which it handled this difficult litigation.
But, we conclude nevertheless that the trial court failed to recognize the critical differences between this Court’s “facial” review of the state legislative redistricting plans in Apportionment I and the nature of the fact-based claims presented in this case. This legal error in the standard of review, as with the legal error in not recognizing the independent significance of the challenge to the plan “as a whole,” led to the trial court’s failure to give any independent legal significance to its finding of unconstitutional intent when examining the challenges to individual districts. Once the trial court found unconstitutional intent, there was no longer any basis to apply a deferential standard of review; instead, the trial court should have shifted *397 the burden to the Legislature to justify its decisions in drawing the congressional district lines.
Thé trial court’s error as to the standard of review can be traced to its analysis in evaluating the challengers’ claims, which it set forth as follows:
It seems that the more reliable focus in such an inquiry would be on what was actually produced by the Legislature, the enacted map. Specifically, an analysis of the extent to which the plan does or does not comply with tier two requirements is a good place to start. Can one draw a map that meets tier-two requirements but nonetheless favors a political party or an incumbent? Sure, but it is more difficult.
Furthermore, a failure to comply with tier-two. requirements not only supports an inference of improper intent, it is an independent ground for finding a map unconstitutional. See Apportionment I, 83 So.3d [at] 640-641. Additional direct and circumstantial evidence of intent may serve to strengthen or weaken this inference of improper intent. Therefore, I first examine the map for apparent failure to comply with tier-two requirements of compactness and utilization of political and geographical boundaries where feasible, then consider any additional evidence that supports the inference that such districts are also in violation of tier-one requirements.
(Emphasis supplied.) In other words, the trial court began by asking whether there was any tier-two violation — whether the district was compact, and whether it followed existing political and geographical boundaries where feasible. Then, the trial court considered the direct and circumstantial evidence of tier-one improper intent only as “additional evidence” to “strengthen or weaken” an “inference of improper intent” that was identifiable from tier-two deficiencies. The trial court did so despite finding that the direct and circumstantial evidence itself had established a violation of the tier-one constitutional standards.
Although the trial court relied on Apportionment I as support for the standard of review it applied, the standard from that case — a facial review based on purely objective, undisputed evidence in the limited record before the Court — does not directly translate to this one — a fact-intensive challenge based on direct and circumstantial evidence developed during an adversarial trial. Discerning which aspects of the standard set forth in Apportionment I apply and which do not is thus of critical importance.
In Apportionment I, this Court rejected the arguments of the Attorney General and the House of Representatives “that a challenger must prove facial invalidity beyond a reasonable doubt,” as is generally considered to be the standard applied to a typical lawsuit challenging the constitutionality of a legislative enactment outside the context of redistricting. 83 So.3d at 607. This Court considered the “beyond a reasonable doubt” standard to be both “a departure from [its] precedent in legislative apportionment jurisprudence” and “ill-suited” to the nature of its review. Id. “Unlike a legislative act promulgated separate and apart from an express constitutional mandate,” this Court stated, “the Legislature adopts a joint resolution of legislative apportionment solely pursuant to the ‘instructions’ of the citizens as expressed in specific requirements of the Florida Constitution governing this process.” Id. at 607-08.
Although the legislative redistricting plan comes before this Court “with an initial presumption of validity,” this Court explained that “the operation of this Court’s process in apportionment cases is *398 far different than the Court’s review of ordinary legislative acts,” including “a commensurate difference in [its] obligations.” Id. at 606. Noting that the “new requirements” of the Fair Districts Amendment “dramatically alter[ed] the landscape with respect to redistricting,” this Court held that its scope of review had “plainly increased, requiring a commensurately more expanded judicial analysis of legislative compliance.” Id. at 607. As this Court would later reason, “the framers and voters” of the Fair Districts Amendment “clearly desired more judicial scrutiny” of the Legislature’s decisions in redistricting. Fla. House of Representatives v. League of Women Voters of Fla. (Apportionment III), 118 So.3d 198, 205 (Fla.2013).
“It is this Court’s duty, given to it by the citizens of Florida, to enforce adherence to the constitutional requirements and to declare a redistricting plan that does not comply with those standards constitutionally invalid.” Apportionment I, 83 So.3d at 607. However, this Court acknowledged in the context of its review in Apportionment I that it would “defer to the Legislature’s decision to draw a district in a certain way, so long as that decision does not violate the constitutional requirements.” Id. at 608. This Court emphasized that its “responsibility [wa]s limited to ensuring compliance with constitutional requirements.” Id. “[Endeavoring to be respectful to the critically important role of the Legislature,” this Court stated that its duty was “not to select the best plan, but rather to decide whether the one adopted by the legislature is valid.” Id. (quoting In re Apportionment Law-1992, 597 So.2d at 285).
Echoing this Court’s language in Apportionment I, the trial court determined— based on “the nature of the legislation and the nature of what is reviewed” — that it should apply the same standard to the challenge presented in this case. Therefore, reciting the principles from Apportionment I, the trial court set forth the standard for its review as follows:
I will therefore, in this case, apply the standard of review articulated in Apportionment I, deferring to the Legislature’s decision to draw a district in a certain way, so long as that decision does not violate the constitutional requirements, with an understanding of my limited role in this process and the important role of the Legislature. My duty “is not to select the best plan” but to determine whether [the challengers] have proved the plan invalid. Apportionment I, 83 So.3d 597 at 608.
The trial court then cited this standard, and its deferential review, in rejecting challenges to certain individual districts.
We conclude that the trial court was correct, initially, in rejecting the “beyond a reasonable doubt” standard, as this Court did in Apportionment I. As this Court stated, “[u]nlike a legislative act promulgated separate and apart from an express constitutional mandate, the Legislature adopts a joint resolution of legislative apportionment solely pursuant to the ‘instructions’ of the citizens as expressed in specific requirements of the Florida Constitution governing this process.” Apportionment I, 83 So.3d at 607-08. Just as there is a difference in evaluating legislative intent with respect to the specific constitutional mandate outlawing improper partisan intent in redistricting, so too is there “a difference between the Court’s role in reviewing a legislative apportionment plan to determine compliance with constitutionally mandated criteria and the Court’s role in interpreting statutes.” Id. at 607 n. 5. The “reason for the different standard,” the trial court correctly noted, is that “the inquiry is into the process, the *399 end result, and the motive behind the legislation” — not “a question of searching for a reasonable interpretation of a statute which would make it constitutional.”
In this respect, the trial court was right to rely on Apportionment I in concluding that the nature of the legislation and the specific constitutional mandate outlawing partisan political gerrymandering require a different standard of review than applied in traditional cases challenging legislative enactments. Where the trial court erred, however, was in discounting the differences between Apportionment I and this case to conclude that the same standard must apply, even though this case involved direct and circumstantial evidence of tier-one constitutional violations that this Court had no ability to review in Apportionment I.
As this Court has explained, its review in Apportionment I was quite different than the challenge presented in this case. Unlike the fact-intensive challenge here, in which the parties had an opportunity to present extensive evidence during an adversarial trial pertaining to whether the plan and individual districts were drawn with improper intent, this Court’s review in Apportionment I was “a facial review based on objective, undisputed evidence in the limited record before the Court.” Apportionment III, 118 So.3d at 200.
In Apportionment I, 83 So.3d at 634, this Court looked to objective measures and tier-two requirements — such as the existence of “bizarre shape[s]” and “appendages” — in an effort to discern whether the map was drawn with improper intent. As this Court stated, “in the context of Florida’s constitutional provision, a disregard for the constitutional requirements set forth in tier two is indicative of improper intent, which Florida prohibits by absolute terms.” Id. at 640.
The evidence of improper intent in this case, to the contrary, involved direct and circumstantial evidence of tier-one violations, of the constitutional intent standard. Yet, despite the existence of testimony and fact-based claims regarding improper intent from a voluminous record that extended far beyond the legislative record to which this Court was constrained in Apportionment I, the trial court still determined that tier-two requirements— compactness and the use of political and geographical boundaries where feasible— were the “more reliable” indicators of improper intent, explaining that “a failure to comply with tier-two requirements” would “support[] an inference of improper intent,” and that “[ajdditional direct and circumstantial evidence of intent may serve to strengthen or weaken this inference of improper intent.” Based on this assumption, the trial court proceeded to “first examine the map for apparent failure to comply with tier-two requirements of compactness and utilization of political and geographical boundaries where feasible, [and] then considered] any additional evidence that supports the inference that such districts are also in violation of tier-one requirements.”
Not surprisingly under this framework of analysis, only where the trial court found a tier-two violation — the appendages in Districts 5 and 10 — did the trial court conclude that a district had been drawn with improper intent to favor a political party, or incumbent. The independent finding that the “redistricting process” and the “resulting map” were “taint[ed]” with “improper partisan intent” was relegated to “buttressing]” the “inference” of improper intent based on the tier-two violation.
We conclude that the trial court erred in focusing first on tier-two violations at the expense of the evidence of tier-one viola *400 tions — violations it specifically found based on the evidence presented. The trial court’s error was then exacerbated by its decision to apply an unduly deferential standard to its review of the map, even after finding the existence of unconstitutional partisan intent.
Certainly, this Court explained in Apportionment I that the judiciary’s role in reviewing an apportionment plan enacted by the Legislature is “not to select the best plan, but rather to decide whether the one adopted by the legislature is valid.” Apportionment I, 83 So.3d at 608 (quoting In re Apportionment Law-1992, 597 So.2d at 285). At that time, this Court stated the general principle that it would “defer to the Legislature’s decision to draw a district in a certain way, so long as that decision does not violate the constitutional requirements.” Id.
But, in Apportionment I, this Court was conducting a “facial” review of the legislative apportionment plan, without fact-finding, to determine whether any improper intent existed in the plan. Unlike that context, here, the trial court found the existence of improper intent, based on evidence presented during an adversarial trial, yet still applied a deferential standard of review. That was error.
The trial court conducted its review as if it were premature to directly address the impact of the tier-one violations the trial court itself specifically found. In particular, the trial court found that the Legislature had “cooperated]” and “collaborated]” with partisan political operatives to draft an apportionment plan favoring the Republican Party and incumbents — in other words, a finding of a tier-one constitutional violation. While the Legislature is generally entitled to deference as a result of its role in the redistricting process, that deference applies only “so long as [its redistricting] decision[s] do[] not violate the constitutional requirements.” Apportionment I, 83 So.3d at 608.
Once a tier-one violation of the constitutional intent standard is found, there is no basis to continue to afford deference to the Legislature. To do so is to offer a presumption of constitutionality to decisions that have been found to have been influenced by unconstitutional considerations. The existence of unconstitutional partisan intent is contrary to the very purpose of the Fair Districts Amendment and to this Court’s pronouncements regarding the state constitutional prohibition on partisan political gerrymandering.
Accordingly, after reaching the conclusion that the “redistricting process” and the “resulting map” had been “taint[ed]” by unconstitutional intent, the burden should have shifted to the Legislature to justify its decisions, and no deference should have been afforded to the Legislature’s decisions regarding the drawing of the districts. In other contexts, states have placed the burden on their legislatures to justify the validity of a redistricting plan when the plan has “raised sufficient issues” with respect to state constitutional requirements. In re Legislative Districting of State, 370 Md. 312, 805 A.2d 292, 325 (2002).
Because there are many ways in which to draw a district that complies with, for example, the constitutional requirement of compactness, which party bears the burden of establishing why a decision was made to accept or reject a particular configuration can ultimately be determinative. This can be seen in reviewing the seven maps initially released to the public by the House.
All of these maps were considered by the Legislature to be maps that complied with the tier-two constitutional standards. *401 But, in one of the maps, designated as H000C9001, there were as few as 14 Republican districts based on 2008 presidential election data and 15 Republican districts based on 2012 presidential data. In the map chosen by the House to move forward in the process, designated as H000C9011, there were 16 Republican districts under both the 2012 and 2008 presidential results. And, after additional revisions, the Legislature’s enacted map performed with 17 Republican districts under the 2008 data and 16 using the 2012 data — actually more favorable to Republicans than the performance of the admittedly gerrymandered 2002 districts under, the same data.[10] This consistent improvement in the Republican performance of the map — even when comparing maps the Legislature itself produced and considered tier-two compliant — reveals that there are many ways to draw constitutionally compliant districts that may have different political implications.
Since the trial court found that the Legislature’s intent was to draw a plan that benefítted the Republican Party, the burden should have been placed on the Legislature to demonstrate that its decision to choose one compact district over another compact district, or one tier-two compliant map over another tier-two compliant map, was not motivated by this improper intent. This is particularly true where the challengers presented evidence that the Legislature’s choices ultimately benefítted the Republican Party and also showed alternative maps that performed more fairly.[11] Unlike in Apportionment I, where this Court remained deferential to the Legislature’s decisions in the absence of a finding of improper intent, there is no longer any basis for this Court to be deferential to the Legislature in fulfilling its own “solemn obligation to ensure that the constitutional rights of its citizens are not violated and that the explicit constitutional mandate to outlaw partisan political gerrymandering ... in redistricting is effectively enforced.” Apportionment TV, 132 So.3d at 137.
VI. LEGAL EFFECT OF FINDING UNCONSTITUTIONAL INTENT
Having now concluded that the trial court erred in the standard of review it applied, we proceed to consider the legal effect of the trial court’s finding of unconstitutional intent under the appropriate standard. In so doing, we reject the dissent’s view that we have “transgressed the boundaries of proper appellate review” and “abandon[ed]” the “restraints of the appel *402 late process.” Dissenting op. at 422-23, 423-24. The Legislature vigorously defended the challenged districts. Rather than foster additional delay and risk another election under unconstitutional districts, we have all the record evidence necessary to evaluate now whether the Legislature’s justifications can withstand legal scrutiny.
A. DISTRICT 5
We begin with District 5, which has been a focal point of the challenge to the Legislature’s redistricting plan. Initially, the trial court invalidated District 5 as “visually not compact, bizarrely shaped,” and in contravention of “traditional political boundaries as it winds from Jacksonville to Orlando,” narrowing at one point to the width of a highway. After the Legislature removed an appendage from Seminole County and widened the district, however, the trial court upheld the remedial version of District 5, concluding that while still “not a model of compactness,” the revised district is “much improved.” Deferring to the Legislature, the trial court summarily rejected the challengers’ proposed East-West configuration of the district, determining that although this configuration was “somewhat more compliant” with the constitutional standards, there were “legitimate non-partisan policy reasons for preferring a North-South configuration for this district over an EasL-West configuration.”
The trial court did not elaborate as to what any of these “non-partisan policy reasons” were. The only legal justification offered by the Legislature, with the support of the Florida State Conference of NAACP Branches, for preferring a North-South configuration to an East-West orientation is to comply with the minority voting protection requirements of the Florida Constitution and the federal Voting Rights Act — specifically, that a North-South configuration is necessary to avoid diminishing the ability of black voters to elect a candidate of their choice.
The challengers contend, though, that the North-South configuration of this district is a linchpin to the Legislature’s efforts to draw a map that favors the Republican Party. They allege that the North-South configuration overpacks Democratic-leaning black voters into the district — that is, .places more black voters in the district than is necessary to ensure that they can elect a candidate of choice — thereby diluting the influence of Democratic minorities in surrounding districts. The challengers rely in part on a trilogy of cases in federal court that trace the unique history of this district, culminating in a 2002 decision from a three-judge panel finding that the Legislature’s “overriding goal with respect to congressional reapportionment” was to adopt a plan that “would maximize the number of districts likely to perform for Republicans.” Martinez, 234 F.Supp.2d at 1300-01; see also DeGrandy v. Wetherell, 794 F.Supp. 1076, 1087-88, 1090 (N.D.Fla.1992) (adopting a redistricting plan drawn by an independent expert, which created the predecessor to District 5 as a black majority-minority district); Johnson v. Mortham, 926 F.Supp. 1460, 1466-67, 1472, 1495 (N.D.Fla.1996) (noting that the prior version of District 5 split every one of the fourteen counties that made up the district, and even split individual precincts, and declaring that the district was “racially gerrymandered” in violation of the Equal Protection Clause).
Even as redrawn by the Legislature and approved by the trial court, District 5 clearly does not strictly adhere to the Florida Constitution’s tier-two requirements of compactness and the utilization of political or geographical boundaries where feasible. It splits seven counties and has numerical compactness scores of .127 on the Reock measure and .417 on the Convex *403 Hull measure, where 1 is the best score. The critical determination, then, is whether the North-South configuration of this district, which extends from Jacksonville to Orlando, is necessary to comply with either the federal Voting Rights Act or the tier-one state constitutional requirement that no district shall be drawn in such a way as to diminish the ability of black voters to elect a representative of their choice — the justifications offered by the Legislature.
Having reviewed the arguments of the parties in detail and studied the unique nature of this district, we conclude that the Legislature has failed to meet its burden to demonstrate that District 5, even as revised, passes constitutional muster. We further conclude that, because the trial court found that District 5 was a key component of the Legislature’s unconstitutional intent in the drawing of the congressional redistricting plan, the trial court erred in conducting only a cursory review of the remedial district and deferring to the Legislature’s North-South configuration on the basis of unstated “non-partisan policy reasons.”
Since the Legislature cannot prove that the North-South configuration is necessary to avoid diminishing the ability of black voters to elect a candidate of their choice, we hold that District 5 must be redrawn in an East-West manner. While the dissent suggests that this holding displaces the Legislature’s chosen configuration with a configuration drawn by operatives aligned with the Democratic Party, see dissenting op. at 422, the argument for an East-West orientation of this district is' not exclusive to the Democratic Party. In fact, an East-West orientation is the only alternative option, and one that the Legislature’s own map drawers — insulated, the dissent itself states, from partisan influence — considered during the redistricting process.
We reach our conclusion as to the continued unconstitutionality of District 5 for several reasons. First, the Legislature’s configuration was entitled to no deference in light of the trial court’s finding of unconstitutional intent. The trial court clearly found that the Legislature’s intent in drawing the congressional redistricting plan generally, and District 5 specifically, was to benefit the Republican Party. The Legislature’s configuration also had the effect of benefitting the long-time incumbent of the district, Congresswoman Corrine Brown, who previously joined with leading Republicans in actively opposing the Fair Districts Amendment and redistricting reform. See Brown, 668 F.3d 1271. Indeed, the remedial version of District 5 still retains approximately 80% of its 2002 benchmark — a redistricting map that was admittedly gerrymandered to favor the Republican Party and incumbents. See Martinez, 234 F.Supp.2d at 1340.
Retaining the same basic shape, while merely tweaking a few aspects of the district, does not erase its history or undo the improper intent that the trial court found. The trial court’s decision to defer to the Legislature’s configuration is contrary to the proper standard that should have applied — shifting the burden to the Legislature to justify its enacted configuration— particularly where the trial court itself continued to acknowledge that the district is “not a model of compactness.”
We conclude that the Legislature cannot justify its enacted configuration. Despite the Legislature’s repeated contentions that a North-South orientation of the district is the only option and is essential to avoid diminishing the ability of black voters to elect a candidate of their choice, there is simply insufficient evidence to support that assertion. Indeed, legislative staffer Alex Kelly initially drew an East-West version of the district, with a BVAP of 44.96%, and *404 concluded that such a configuration would be constitutionally compliant. The Legislature relies on the trial court’s finding that Kelly was straightforward and credible elsewhere, but offers no persuasive explanation as to why this version of District 5 was rejected or why Kelly’s assessment in this circumstance was incorrect.
During the trial, the Legislature argued that it had increased the BVAP of District 5 over 50% — a decision made during a nonpublic meeting at the end of the redistricting process — in order to prevent vote dilution and avoid retrogression. The trial court specifically found that argument to be “not supported by the evidence” and there to have been no showing that a majority-minority district was “legally necessary.”
After redrawing the district, the BVAP of remedial District 5 is 48.11%. The Legislature continues to argue that any additional diminishment in the BVAP would prevent black voters from electing a candidate of their choice. But neither the evidence, nor the case law, bears this out.
As of 1996, following the decision in Johnson that required the predecessor district to be redrawn, the predecessor to District 5 had a total black population of 47.0% and a total BVAP of 42.7%. Martinez, 234 F.Supp.2d at 1808. By 2000, the benchmark district had a total black population of 50.8% and a total BVAP of 46.7%. Id. The district performed for the black candidate of choice in every election from 1992 through 2000. Id.
In 2002, the total black population of the district was 51.4%. Id. at 1307. The total BVAP was 46.9%. Id. The federal court in Martinez determined that the BVAP of 46.9% “will afford black voters a reasonable opportunity to elect candidates of choice and probably will in fact perform for black candidates of choice.” Id. The actual election results show this to be true — the district has continued to perform for the black candidate of choice in every election from 2000 through the present.
The challengers’ proposed East-West configuration of the district has a BVAP of 45.12% — higher than the BVAP in the initial draft district drawn by Alex Kelly. This is well within the range of the 42.7%, 46.7%, and 46.9% BVAP percentages that were addressed by the federal court in Martinez and considered to be sufficient to “afford black voters a reasonable opportunity to elect candidates of choice” and to “in fact perform for black candidates of choice.”[12] Id. “This is so in part because,” the federal court in Martinez stated,
blacks constitute 61.3% of registered Democrats in [the predecessor to District 5], and Democrats constitute 63.8% of registered voters. Republicans constitute only 22.7% of registered voters. Actual voting also is strongly Democratic; in the 2000 presidential election, voters in [the predecessor to District 5] voted 63.7% for Mr. Gore and 34.2% for Mr. Bush. The black candidate of choice is likely to win a contested Democratic primary, and the Democratic nominee is likely to win the general election.
Id. at 1308.
The same logic applies to an East-West configuration of the district. Black voters *405 constitute 66.1% of registered Democrats under this configuration, and Democrats constitute 61.1% of registered voters. Republicans, by contrast, constitute only 23.0% of registered voters. This compares very favorably to the same respective numbers in the 2002 district upheld by the federal court in Martinez.
Thus, in an East-West orientation of the district, the black candidate of choice is still likely to win a contested Democratic primary, since black voters constitute 66.1% of registered Democrats. And the Democratic candidate is still likely to win the general election, since Democratic voters outnumber Republicans 61.1% to 23.0%. In other words, just as- noted in Martinez as a basis for concluding that the prior version of District 5 afforded black voters a reasonable opportunity to elect a candidate of choice, “[t]he black candidate of choice is likely to win a contested Democratic primary, and the Democratic nominee is likely to win the general election.”[13] Martinez, 234 F.Supp.2d at 1308.
The Legislature’s contrary argument rests entirely on the premise that the BVAP of the district cannot be decreased from 48.11% to 45.12%. Of course, the trial court already rejected the Legislature’s argument, based on the same asserted interest in protecting black voters, that the BVAP needed to be over 50%, and in urging this Court to uphold the revised district, the Legislature has now tacitly conceded that 48.11% is sufficient.
But, beyond that, the United States Supreme Court has recently articulated — in a case with a similar claim of overpacking black voters to maintain the continued political dominance of the Republican Party in surrounding districts — that the BVAP itself cannot be viewed in a vacuum. In Alabama Legislative Black Caucus v. Alabama, - U.S. -, 135 S.Ct. 1257, 1272, 191 L.Ed.2d 314 (2015), the Supreme Court emphasized that it is the “ability to elect a preferred candidate of choice,” not “a particular numerical minority percentage,” that is the pertinent point of reference.
The language of the Voting Rights Act that protects against adopting a redistricting plan that “has the purpose of or will have the effect of diminishing the ability of [the minority group] to elect their preferred candidates of choice” — language incorporated into our tier-one state constitutional standards — “does not require maintaining the same population percentages.” Id. at 1272-73. Instead, the Supreme Court has told us, this requirement “is satisfied if minority voters retain the ability to elect their preferred candidates.” Id. at 1273. Providing an example, the Supreme Court stated that “it would seem highly unlikely that a redistricting plan that, while increasing the numerical size of the district, reduced the percentage of the black population from, say, 70% to 65% would have a significant impact on the black voters’ ability to elect their preferred candidate.” Id.
Accordingly, we reject the Legislature’s argument that an East-West version of the district would diminish the ability of black voters to elect a candidate of their choice. We also reject the dissent’s contention that an East-West district causes *406 the redistricting map to become significantly less compact. See dissenting op. at 420-22. There is no doubt, as noted by the dissent, that the East-West orientation is longer, with a correspondingly greater perimeter and area. But length is just one factor to consider in evaluating compactness.
As this Court stated in Apportionment I, “the object of the compactness criterion is that a district should not yield ‘bizarre designs.’ ” 83 So.3d at 634. And as the Supreme Court of Washington has recognized, in a decision cited favorably by this Court in Apportionment I, “the phrase ‘as compact as possible’ does not mean ‘as small in size as possible,’ but rather ‘as regular in shape as possible.’ ” Kilbury v. Franklin Cnty. ex rel. Bd. of Cnty. Comm’rs, 151 Wash.2d 552, 90 P.3d 1071, 1077 (2004).
There is no doubt that an East-West version of District 5 is visually less “unusual” and “bizarre” than the meandering North-South version enacted by the Legislature. Apportionment I, 83 So.3d at 634. There is also no doubt that the numerical compactness scores actually favor the East-West orientation: the different configurations have essentially the same Reock score (.12 for a proposed East-West version of the district, and .13 for the Legislature’s North-South, where 1 is the most compact), while an East-West district fares significantly better on the Convex Hull measure (.71 for the East-West as compared to .42 for the North-South, where 1 is again the most compact). Further, an East-West orientation allows for fewer incorporated city and county splits than the Legislature’s North-South district — another consideration in determining tier-two compliance.
The reality is that neither the North-South nor the East-West version of the district is a “model of compactness,” as the trial court stated. Other factors account for this phenomenon, “including geography and abiding by other constitutional requirements such as ensuring that the apportionment plan does not deny the equal opportunity of racial or language minorities to participate in the political process or diminish their ability to elect representatives of their choice.” Id. at 635. And while the dissent cherry-picks a favorable statistic to highlight the supposed decrease in the compactness of District 2 under an East-West version of District 5, see dissenting op. at 421-22, the challengers have demonstrated that the decrease in the compactness of District 2 is an outlier; in fact, as few as four and as many as seven other districts can be drawn in a more compact manner by drawing District 5 from East to West. '
The bottom line is that none of the Legislature’s justifications for its gerrymandered version of District 5, and none of its complaints about an alternative East-West configuration, can withstand legal scrutiny. Because the trial court erred in deferring to the Legislature’s enacted North-South configuration, and because the Legislature cannot justify this configuration, District 5 must be redrawn in an East-West orientation.
B. DISTRICTS 13 & 14
We turn next to Districts 13 and 14, in the Tampa Bay area, which the challengers contended were drawn in violation of the constitutional requirements. In addition to relying on the trial court’s finding that the entire map was tainted by unconstitutional intent, the challengers asserted specifically that the Legislature’s configuration of Districts 13 and 14 mirrored the configuration known to have been favored by political operatives, in which District 14 was drawn, to cross Tampa Bay from Hillsborough County, split *407 ting Pinellas County and the City of St. Petersburg to move a portion of the black population from District 18 into District 14. In support, the challengers pointed to an e-mail communication from consultant Frank Terraferma to consultant Rich Heffley and an employee of the Republican Party of Florida, which described this region as “far from perfect” in a draft map where District 14 did not cross Tampa Bay.
The enacted configuration of these two districts, which crossed Tampa Bay, added more Democratic voters to an already safely Democratic District 14, while ensuring that District 13 was more favorable to the Republican Party.[14] The challengers thus contended that the Legislature’s configuration of these districts was directly connected to the trial court’s finding .that the enacted map was unconstitutionally drawn to favor the Republican Party.
The trial court denied the challenge to these districts, reasoning that there were “no flagrant tier-two deviations from which” to “infer unlawful intent.” The trial court stated that it “simply” could not “conclude, on partisan effect alone, that the decision to incorporate portions of South St. Petersburg into District 14 was done with the intent to benefit the Republican Party or the ineumbent member of Congress.”
We conclude that the trial court erred in rejecting the challenge to these districts. The trial court erroneously required a “flagrant tier-two deviation” in order to “infer unlawful intent,” rather than viewing the configuration of these districts through the lens of the direct and circumstantial evidence of improper intent presented at trial. Once the trial court found unconstitutional intent, the Legislature’s enacted configuration was no longer entitled to deference, and it becomes the Legislature’s burden to justify its decision to draw the districts in a certain way.
The Legislature’s asserted justification for picking up voters from Pinellas County in District 14 was to increase minority voting strength in that district, which the Legislature considered to be preferable— though not required — from a state constitutional tier-one and federal Voting Rights Act perspective. The trial court did not, however, make any findings that it was necessary to add black voters from Pinel-las County to District 14 in order to avoid diminishing the ability of black voters to elect a representative of their choice.[15]
During trial, the challengers showed that it is possible not to cross Tampa Bay and still maintain tier-two compliance. In fact, as the charts below indicate,[16] following the county boundary significantly increases the numerical compactness scores of District 13, although it does cause a decrease in the scores of surrounding districts.
*408 [[Image here]]
Reock Score[17] Convex Hull Score[18]
Enacted Plan (H000C9047) Romo Alternative (Romo A) Enacted Plan (H00QC9047) Romo Alternative (Romo A)
CD 12 0.40 0.38 0.81 0.79
CD13 0.46 0.57 0.82 0.91
CD 14 0.36 0.28 0.69 0.60
CD 15 0.44 0.3 0.75 0.67
CD16 0.42 0.32 0.81 0.80
CD17 0.64 0.3 0.8 0.68
Avg. 0.45 0.38 0.79 0.74
In rejecting the challenge to these districts, the trial court emphasized the decrease in the overall compactness scores in the region, ultimately determining that the Legislature “was not required to make this tradeoff in compactness to avoid splitting Pinellas County.” However, as this Court has recognized, following county lines may result in a reduction in compactness scores. See Apportionment I, 83 So.3d at 635 (explaining that the compactness of the districts “cannot be considered in iso *409 lation” because other factors influence a district’s compactness, including the “Legislature’s desire to follow political or geographical boundaries or to keep municipalities wholly intact”).
The trial court’s decision to defer to the Legislature’s configuration was contrary to the proper standard that should have applied once the trial court found that the Legislature’s intent in drawing the congressional redistricting plan was to benefit the Republican Party. Because the Legislature cannot justify its enacted configuration of these districts based on race — the only justification that was offered — the trial court should have invalidated these districts. Accordingly, Districts IB and 14 must be redrawn to avoid crossing Tampa 'Bay.
C. DISTRICTS 26 & 27
The challengers also mounted an individual attack against the validity of Districts 26 and 27, claiming that the enacted configuration of these two districts needlessly divided the City of Homestead to Republican gain — turning one Republican district and one Democratic district into two Republican-leaning districts.[19] In support, the challengers relied on the general evidence of improper intent in the plan as a whole, as well as specifically on an e-mail chain between consultants Heff-ley, Terraferma, and Reichelderfer that took place after the Senate released a draft map that did not split Homestead. In this e-mail chain, the operatives stated that the configuration of these districts was “pretty weak” and that the House “need[ed] to fix” it. The Senate’s draft version, not splitting Homestead, is shown on the left below, with the enacted map on the right.
[[Image here]]
The trial court denied the challenge to these two districts, stating that any tier-two differences between the enacted map and an alternative map introduced into evidence during trial by the challengers were de minimis since the enacted and alternative plans split about the same number of counties and cities in the region. The trial court stated that It would have been “selecting a plan that [it] found subjectively better rather than determining if [the challengers] have proved the enacted *410 plan invalid,” if it were to invalidate the enacted configuration of these districts “based on the objective tier-two evidence” presented. The trial court also summarily concluded that it did not find the enacted configuration to have been “based on unlawful partisan intent.”
We conclude that the trial court erred in rejecting the challenge to these districts. Based on the trial court’s finding of unconstitutional intent to benefit the Republican Party, the burden should have shifted to the Legislature to justify its configuration of these districts. Thus', instead of deferring to the Legislature’s configuration and refraining from “selecting a plan [it] found subjectively better,” the trial court should have required the Legislature to demonstrate that the decision to split Homestead between Districts 25 and 26 was not done to benefit the Republican Party. Because the Legislature’s asserted justification for its configuration of these districts — to protect minority voting rights — simply cannot be justified, these districts must be redrawn to avoid splitting Homestead.
D. DISTRICT 25
Along with the individual challenge to Districts 26 and 27 based on the split of Homestead, the challengers also argued that nearby District 25 needlessly divided Hendry County, in violation of the constitutional requirements. The trial court summarily rejected this challenge, considering it in conjunction with the challenge to Districts 26 and 27 and concluding simply that the challengers had not proved invalidity because they had not demonstrated more than “de minimis” tier-two deficiencies.
This was error. Having found improper intent in the adoption of the redistricting plan, the trial court should not have deferred to the Legislature’s configuration but should have, instead, shifted the burden to the Legislature to justify its decision to divide Hendry County.
[[Image here]]
The decision to adopt a configuration of District 25 that split Hendry County — as the Senate’s map had done but the House’s had not — was made in a non-public meeting at the end of the redistricting process. There is thus no record from the time this decision was made to explain why the Legislature chose the Senate’s configuration of this district over the House’s, even though the Senate’s configuration rendered the district less numerically compact while splitting a county boundary and without improving the compactness of the adjacent district, District 20.
The Legislature’s asserted justification at trial and on appeal in this Court for splitting Hendry County is chiefly based *411 on concerns related to preclearance requirements under Section 5 of the Voting Rights Act, since Hendry County was a “covered” jurisdiction to which Section 5 applied — that is, a county for which the state had to obtain federal permission pri- or to enacting any law related to voting in that county. The Legislature argues that, if it had placed Hendry County entirely within District 25, the Department of Justice would have denied preclearance.
We reject the Legislature’s justification for its decision to split Hendry County for at least two reasons. First, the House itself had drawn District 25 with Hendry County almost entirely included in the district, and the House considered its map to be constitutionally compliant. The Legislature’s concerns about preclearance thus appear to be post-hoc rationalizations for the enacted configuration.
Second, to the extent preclearance is offered as a justification, preclearance concerns are no longer applicable after the. United States Supreme Court’s decision in Shelby County v. Holder, — U.S. —, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013). In that case, the Supreme Court invalidated the “coverage formula” in Section 4 of the Voting Rights Act, thereby effectively invalidating the preclearance process established by Section 5 of the Act unless and until Congress creates another formula. Id. at 2631. Although the Legislature could not have anticipated the Supreme Court’s decision at the time of the 2012 redistricting, Hendry County was not subject to preclearance at the time the Legislature enacted the remedial plan it now urges this Court to approve. In any event, we conclude that the Legislature has not demonstrated that keeping Hen-dry County whole would diminish the ability of black voters to elect a candidate of choice or cause any other tier-one minority voting protection concerns.
Accordingly, based on its error in the standard of review, the trial court should not have deferred to the Legislature’s enacted configuration, and that chosen configuration cannot be justified. District 25 must be redrawn to avoid splitting Hendry County.
E. DISTRICTS 21 & 22
Finally, the challengers individually attacked the validity of Districts 21 and 22, contending that these districts could have been drawn in a more constitutionally compliant manner by “stacking” them on top of each other, in a horizontal configuration, rather than configuring the districts to run vertically, parallel to each other along the Atlantic coast. Below, the enacted vertical configuration is shown on the left, whereas the “stacked” alternative configuration is shown on the right.
*412 [[Image here]]
Again applying a deferential standard of review, the trial court rejected this challenge, concluding that the challengers had not “met their burden of showing unnecessary deviation from tier-two requirements given the various tradeoffs required to draw compact districts in the region as a whole.” The trial court also stated that the challengers had not “shown that improper intent led to the adoption of Districts 21 and 22.”
However, as with the other individual district challenges, the trial court applied the incorrect standard. Based on its finding of unconstitutional intent, the trial court should not have deferred to the Legislature’s enacted configuration of these districts, but should have instead shifted the burden to the Legislature to justify its decision to draw the districts in this manner.
We conclude that the Legislature has not done so. At trial, the House’s chief map drawer, Alex Kelly, testified that the “stacked,” horizontal configuration represented “an opportunity to improve” the map. According to Kelly, this configuration would have been more compact and would have broken fewer political boundaries, and it could have been accomplished without violating any tier-one minority voting protection requirements. During a non-public meeting at the end of the redistricting process, Kelly presented this alternative configuration of the districts, but the Senate ultimately determined, without explanation, to reject this approach.
Because the Legislature has not justified its enacted configuration of these districts, we conclude that the districts must be redrawn. We do not, however, instruct that the Legislature must necessarily redraw the districts in a “stacked,” horizontal configuration. Indeed, the challengers have conceded that a vertical configuration could perhaps pass constitutional muster, and their alternative maps introduced at trial did, in fact, configure these districts *413 in a vertical manner. Accordingly, we leave it for the Legislature to determine how to redraw these two districts, with the understanding that tier-two compliance could be improved and, given the shift in the burden, that the Legislature must be able to justify its redrawn configuration of these districts.
VIL REMEDY
We now turn to the remedy. The specifically challenged districts notwithstanding, the challengers suggest that a broader remedy is required and urge this Court to invalidate the whole map and either redraw it ourselves or order the trial court to redraw it, perhaps with the assistance of an appointed expert. The Legislature counters that this Court lacks the authority to do so, because a congressional redistricting plan may be enacted only by a state legislature pursuant to article I, section 4, clause 1, of the United States Constitution, which vests exclusive authority to regulate the time, place, and manner of congressional elections in state legislatures, subject only to oversight by Congress. Although we reject the Legislature’s argument that this Court has no authority to adopt a plan, if necessary, we decline the invitation to do so at this time.
The Colorado Supreme Court has explained that state courts are empowered to enact constitutional redistricting plans for the United States Congress “when the legislature fails to do so.” People ex rel. Salazar v. Davidson, 79 P.3d 1221, 1232 (Colo.2003). The Colorado high court has stated that state courts “have the authority to evaluate the constitutionality of redistricting laws and to enact their own redistricting plans when a state legislature fails to replace unconstitutional districts with valid ones.” Id. “In such a case,” the Colorado Supreme Court has reasoned, “a court cannot be characterized as ‘usurping’ the legislature’s authority; rather, the court order fulfills the state’s obligation to provide constitutional districts for congressional elections in the absence of legislative action.” Id.
We agree, but we have determined that in this case the Legislature has not failed to conform to a ruling from this Court requiring it to adopt constitutionally compliant congressional districts, and, in fact, swiftly enacted a remedial redistricting plan in response to the trial court’s judgment. We thus conclude that the appropriate remedy at this juncture is to require the Legislature to redraw the map, based on the directions set forth by this Court.
The Legislature need not, in addition, redraw the entire map. Although we have struggled with this issue, particularly in light of the admittedly gerrymandered 2002 map that was used as a baseline for the current districts, we have ultimately determined that requiring the entire map to be redrawn is not the remedy commensurate with the constitutional violations found in this case. Further, we note that the challengers did not allege, as a separate claim, that the Legislature’s reliance on the 2002 map was a basis for invalidating the whole map, nor did they identify a neutral map that showed how all of the districts could be redrawn in a manner more objectively compliant with the constitutional requirements.
We have, instead, instructed the Legislature on which districts must be redrawn — Districts 5, 13, 14, 21, 22, 25, 26, and 27 — and provided precise guidelines as to the deficiencies in these districts. Although we decline to require the whole plan to be redrawn, it follows that all adjacent districts affected by the reconfiguration of the specific districts being redrawn must also be redrawn. We have, in addition, been asked by the challengers to *414 provide specific directives that the Legislature must follow in redrawing the districts.
It is true, as the Legislature argues, that the judiciary is generally “without authority to review the internal workings” of the Legislature. Fla. Senate v. Fla. Pub. Emps. Council 79, AFSCME, 784 So.2d 404, 409 (Fla.2001). But it is also true, as this Court has recognized in another of its recent redistricting opinions, that Florida has a “strong public policy, as codified in our state constitution, favoring transparency and public access to the legislative process.” Apportionment IV, 182 So.3d at 144. The Legislature’s failure to preserve redistricting records and its decision to make important changes to the map during non-public meetings are factors that caused the trial court, and cause this Court, great concern as to whether the Legislature has complied with the constitutional provision to outlaw partisan political gerrymandering.
This is particularly so given that the Legislature itself proclaimed that it would conduct the most open and transparent redistricting process in the history of the state, and then made important decisions, affecting numerous districts in the enacted map, outside the purview of public scrutiny. As this Court has previously stated, “[i]f the Legislature alone is responsible for determining what aspects of the reapportionment process are shielded from discovery, the purpose behind the voters’ enactment of the article III, section 20(a), standards will be undermined.” Id. at 149.
While the congressional redistricting plan is somewhat unique in that it required compromise between the two legislative chambers — unlike the state House and Senate maps that were drawn solely within each respective chamber — a redistricting plan enacted by the Legislature is also unique as compared to other types of legislation, in that it involves a specific “constitutional restraint on the Legislature’s actions.” Id. at 147. The dissent’s claim that there is nothing “unique” about the challenge in this case, dissenting op. at 424-25, is unavailing — and belied by its own admonitions about how this Court’s alleged errors are particularly grave in the context of redistricting.
In typical cases challenging the constitutionality of a legislative enactment, the relevant inquiry is whether the enacted legislation violates some individual right or contravenes some prohibition on the type of law the Legislature is empowered to enact. The traditional constitutional analysis of enacted legislation does not involve, as it does here, “a specific constitutional direction to the Legislature, as to what it can and cannot do with respect to drafting legislative reapportionment plans.” Apportionment IV, 132 So.3d at 147. Simply put, this case does not pit this Court versus the Legislature, but instead implicates this Court’s responsibility to vindicate “the essential right of our citizens to have a fair opportunity to select those who will represent them.” Id. at 148.
We therefore set forth the following guidelines and parameters, which we urge the Legislature to consider in adopting a redrawn map that is devoid of partisan intent. First, in order to avoid the problems apparent in this case as a result of many critical decisions on where to draw the lines having been made outside of public view, we encourage the Legislature to conduct all meetings in which it makes decisions on the new map in public and to record any non-public meetings for preservation. As we stated in Apportionment IV, “one of our state constitutional values is a strong and well-established public policy of transparency and public access to the legislative process.” Id. at 146. This transparency is critical in light of both the purpose of the Fair Districts Amendment *415 to outlaw partisan manipulation in the redistricting process and the trial court’s finding here that “an entirely different, separate process” to favor Republicans and incumbents was undertaken' contrary to the Legislature’s assertedly transparent redistricting effort. Id. at 149.
Second, the Legislature should provide a mechanism for the challengers and others to submit alternative maps and any testimony regarding those maps for consideration and should allow debate on the merits of the alternative maps. The Legislature should also offer an opportunity for citizens to review and offer feedback regarding any proposed legislative map before the map is finalized.
Third, the Legislature should preserve all e-mails and documents related to the redrawing of the map. In order to avoid additional, protracted discovery and litigation, the Legislature should also provide a copy of those documents to the challengers upon proper request.
Finally, we encourage the Legislature to publicly document the justifications for its chosen configurations. That will assist this Court in fulfilling its own solemn obligation to ensure compliance with the Florida Constitution in this unique context, where the trial court found the Legislature to have violated the constitutional standards during the 2012 redistricting process.
VIII. THE VOTERS SOUGHT FAIR DISTRICTS
Before we conclude, we observe that this is neither the first, nor likely the last, time this Court must confront a challenge to a redistricting plan enacted by the Legislature. In each case, we have endeavored to give meaning to the intent of the framers and voters who passed the Fair Districts Amendment to outlaw partisan political gerrymandering — no easy task given how entrenched this practice has been for years in the politics of crafting Florida’s district boundaries.
A reader of Justice Canady’s dissent in isolation could be forgiven for believing that this Court’s decision here amounts to a creative maneuver designed to overstep its proper bounds, done in order to usurp the Legislature’s role in the redistricting process. The dissent’s attacks on this Court’s analysis are extravagant, even when measured against prior dissenting opinions in our recent redistricting cases that have accused this Court of devising “a radical alteration in the operation of the separation of powers.” Apportionment IV, 182 So.3d at 160 (Canady, J., dissenting). The barrage of epithets employed by the dissent includes the following colorful array: “fallacious”; “fabricated”; “extreme distortion”; “revolutionary deformation”; “teeming with judicial overreaching”; “creatively cobbled”; “aggressive invasion”; “aberrant decision”; and “unprecedented incursions.”[20] Dissenting op. at 417, 417, 417-18, 420, 424-25.
Of course, we categorically reject the dissent’s many derisive criticisms. And we point out that the dissent’s overblown claims that this Court has violated the separation of powers, and has done away with the presumption of constitutionality applied to legislative acts in the redistricting context, are in fact nothing new. In Apportionment I, the dissent repeatedly chastised this Court for “casting] aside the presumption of constitutionality.” Apportionment I, 83 So.3d at 696 (Canady, J., concurring in part and dissenting in part). *416 In Apportionment III, the dissent charged that this Court had “la[id] the groundwork for the unrestrained judicial intrusion” into the redistricting process. Apportionment III, 118 So.3d at 218 (Canady, J., dissenting) (internal quotation omitted). And in Apportionment IV, the dissent hyperboli-cally accused this Court of “grievously vio-lat[ing] the constitutional separation of powers.” Apportionment IV, 132 So.3d at 156 (Canady, J., dissenting).
The dissent’s position has certainly been consistent. But so too has this Court’s. We pointed out in Apportionment I that the Fair Districts Amendment “dramatically alter[ed] the landscape with respect to redistricting,” increasing the scope of judicial review and commensurately requiring “more expanded judicial analysis of legislative compliance.” Apportionment I, 83 So.3d at 607. We emphasized in Apportionment III that “the framers and voters clearly desired more judicial scrutiny” of the Legislature’s decisions in drawing the state’s congressional and legislative districts. Apportionment III, 118 So.3d at 205. And we reiterated in Apportionment IV that there can hardly be a more compelling interest than the public interest in ensuring that the Legislature does not engage in unconstitutional partisan political gerrymandering. Apportionment IV, 132 So.3d at .147-48.
Far from upending the law, then, our legal analysis today adheres to our recent redistricting precedents. The dissent, to the contrary, continues its refusal to acknowledge the import of the Fair Districts Amendment. As Chief Justice Labarga eloquently stated in his concurrence in Apportionment IV, this Court has an “important duty” to “honor and effectuate the intent of the voters in passing Florida’s groundbreaking constitutional amendment prohibiting partisan or discriminatory intent in drawing the congressional apportionment plan.” 132 So.3d at 154-55 (Labarga, J., concurring). This is a responsibility we undertake with the utmost of seriousness — not because we seek to dictate a particular result, but because the people of Florida have, through their constitution, entrusted that responsibility to the judiciary.
IX. CONCLUSION
In conclusion, we affirm the trial court’s factual findings and ultimate determination that the redistricting process and resulting map were “taint[edj” by unconstitutional intent to favor the Republican Party and incumbents. However, we reverse the trial court’s order approving the remedial redistricting plan because we conclude that, as a result of legal errors, the trial court failed to give the proper effect to its finding of unconstitutional intent, which mandated a more meaningful remedy commensurate with the constitutional violations it found.
Through this opinion, we have provided clear guidance as to the specific deficiencies in the districts that the Legislature must redraw — Districts 5, 13, 14, 21, 22, 25, 26, 27, and all other districts affected thereby — and we have urged the Legislature in light of the trial court’s findings in this case to consider making all decisions on the redrawn map in public view. We have every confidence that the Legislature, given this guidance, will conduct itself in a manner that will fulfill the purpose of the Fair Districts Amendment, including the need for transparency and neutrality in drawing the state’s congressional districts.
As to the remedy, we are aware that this litigation has now spanned more than three years and the qualifying period for the next congressional election of 2016 is not far away. We therefore urge that the redrawing of the map be expedited. We *417 have chosen to relinquish this case to the trial court for a limited period of 100 days from the date of this opinion, therefore retaining jurisdiction, and we anticipate that the trial court can perform an oversight role should any disputes arise.[21] To avoid any further delays, we have also limited the time for filing a motion for rehearing or clarification to five days from the date of this opinion and have limited the time for filing a response to such a motion to three days from the date the motion is filed.
It is so ordered.
LABARGA, C.J., and QUINCE and PERRY, JJ., concur.
LEWIS, J., concurs in result.
CANADY, J., dissents with an opinion, in which POLSTON, J., concurs.

. We reject the Legislature's federal constitutional challenge to the Fair Districts Amendment. The Supreme Court's recent opinion in the Arizona case confirms that neither the “Elections Clause” of the United States Constitution, U.S. Const, art. I, § 4, cl. 1, nor federal law, 2 U.S.C. § 2a(c), prohibits the people of a state, through the citizen initiative process, from directing the way in which its congressional district boundaries are drawn. As the Supreme Court explained, "[bjanning lawmaking by initiative to direct a State's method of apportioning congressional districts” would "stymie attempts to curb partisan gerrymandering, by which the majority in the legislature draws district lines to their party's advantage.” Ariz. State Legislature, 135 S.Ct. at 2676, 2015 WL 2473452, at *20; see also Brown, 668 F.3d at 1280 (rejecting a federal constitutional challenge to the Fair Districts Amendment based on reasoning wholly consistent with the Supreme Court's reasoning in Arizona State Legislature).

. The issues raised on appeal by the challengers are: (1) the trial court erred in requiring only two districts to be redrawn after finding constitutionally improper intent in the enacted congressional redistricting plan; (2) Congressional Districts 5, 13, 14, 21, 22, 25, 26, and 27 are independently unconstitutional; (3) this Court should craft a meaningful remedy, either by adopting a constitutionally valid plan or assisting the Legislature so that it can adopt a plan that complies with the Florida Constitution; and (4) the trial court erred in rejecting the challengers' attempt to re-open the evidence to introduce additional allegations of improper partisan intent.
We summarily reject the challengers’ claim regarding the trial court's denial of their motion to re-open the evidence. Although the email the challengers sought to introduce after the close of evidence did provide some additional circumstantial support for their claim of improper intent, the challengers themselves have conceded that it was cumulative to other evidence. Thus, while it may have been relevant evidence and properly introduced during the trial if the challengers had been able to obtain it sooner, the trial court did not abuse its discretion in denying the motion to reopen the case, and the challengers were not, in any event, prejudiced since the trial court found the existence of unconstitutional intent.

. The Legislature also raises the following three issues on cross-appeal: (1) the trial court's order, improperly discourages public participation in the redistricting process; (2) under the Florida Constitution, the controlling intent is the intent of the Legislature as a collective body; and (3) article III, section 20, of the Florida Constitution is invalid because it violates the United States Constitution.
As to the claim regarding public participation, we clarify that we do not read the •trial court's order as discouraging public input in redistricting. There is nothing inherently in violation of the law or the Florida Constitution for an individual to anonymously submit a map to the Legislature for consideration or to submit a map through a third party. We conclude that any comments by the trial court to the contrary were made in the specific context of the facts and circumstances of this case and do not amount to error.

. We conclude — as agreed by both parties— that amici curiae LatinoJustice PRLDEF, Florida New Majority, and Mi Familia Vota lack standing to challenge the validity of Congressional District 9. Amici curiae did not appear in the trial court to raise this claim, and it is well-settled that amici are not permitted to raise new issues. See Riechmann v. State, 966 So.2d 298, 304 n. 8 (Fla.2007).

. We use the term "challengers,” which has been used by this Court in prior opinions during the course of this litigation, to refer collectively to the plaintiffs in the trial court, who are the Appellants/Cross-Appellees in this Court. These litigants that challenged the constitutionality of the congressional redistricting plan enacted in 2012 include two separate groups, which have described themselves as the "Coalition plaintiffs” and the "Romo plaintiffs.” The “Coalition plaintiffs” consist of the League of Women Voters of Florida, Common Cause, and four individually named parties. The National Council of La Raza was formerly a member of the "Coalition plaintiffs” but later voluntarily dismissed all claims and withdrew as a party in the case prior to the trial. The "Romo plaintiffs” consist of lead plaintiff Rene Romo and six other individually named parties. There has rarely been a need to distinguish between the two groups for purposes of the issues to come before this Court, and the circuit court consolidated the two lawsuits filed by these groups that challenged the Legislature’s 2012 congressional redistricting plan.

. "Amendment 5 is now codified in article III, section 21, of the Florida Constitution. The standards in article III, section 20 — governing congressional reapportionment — and those in article III, section 21 — governing legislative reapportionment — are identical.” Id. at 139 n. 1.

. In redrawing Districts 5 and 10, the Legislature's remedial redistricting plan also slightly *387 altered the boundaries of five other congressional districts — Districts 6, 7, 9, 11, and 17. All of the remaining districts were unchanged from the configuration enacted in the Legislature’s 2012 redistricting plan.

. The federal district court’s opinion in Texas was subsequently vacated on other grounds by the United States Supreme Court after that Court issued its recent decision in Shelby County, Alabama v. Holder, - U.S. -, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013), holding a portion of the Voting Rights Act unconstitutional. See Texas v. United States, - U.S. -, 133 S.Ct. 2885, 186 L.Ed.2d 930 (2013).

 This is consistent with the approach taken by [this] Court in Apportionment I. The Court invalidated the entire Senate plan but gave specific instructions as to which districts required corrective action. Id. at 684-686.

. The 2002 benchmark plan performed with 15 Republican districts under the 2008 presidential data and 14 Republican districts under the 2012 data, though there were only twenty-five total districts in that map, as compared to twenty-seven total districts in the 2012 map after Florida gained two districts based on the results of the 2010 Census.

. The Legislature has strongly disputed the relevance of these alternative maps, going so far as to assert that this Court should not consider the alternative maps at all because they were either drawn by partisan operatives aligned with the Democratic Party or of unknown origin. But alternative maps are not on trial themselves, as is the Legislature’s map, and they can provide "relevant proof that the Legislature's apportionment plans consist of district configurations that are not explained other than by the Legislature considering impermissible factors, such as intentionally favoring a political party or an incumbent” — as the trial court found the Legislature to have done in this case. Apportionment I, 83 So.3d at 611. Nevertheless, we have reviewed only the alternative maps actually introduced into evidence during the trial and remedial proceedings, rather than any of the summary-judgment maps, and have relied on those maps only insomuch as they show alternate ways — not necessarily the best or legally required way — to configure the districts.

. Although the dissent states that our review of minority voting strength as to the East-West configuration of District 5 ultimately amounts to "we know retrogression when we see it,” dissenting op. at 422, we clearly rely on longstanding precedent applied by the three-judge federal district court panel in Martinez — the last time this exact district was challenged. Our conclusion that a BVAP of 45.12% does not diminish the ability of black voters to elect a candidate of choice — a BVAP percentage squarely within the range of prior BVAP percentages that precedent has established not to diminish the ability of black voters to elect a candidate of choice — is hardly subjective or arbitrary.

. Contrary to the dissent’s accusation that we fail to apply any objective standard to our retrogression review of the minority voting strength of an East-West district, see dissenting op. at 421-22, our analysis is consistent with the standard set forth by this Court in Apportionment I: "To undertake a retrogression evaluation requires an inquiry into whether a district is likely to perform for minority candidates of choice.” 83 So.3d at 625. This is precisely what we have done with respect to a proposed East-West orientation of District 5.

. Indeed, although District 13 still leans Democratic under the elections data relied on by the parties, it actually elected Republican Representative David Jolly over Democrat Alex Sink in a close election in 2014.

. District 14 was, prior to 2012, and still is, under the 2012 .map, represented by Kathy Castor, a white Democratic congresswoman.

.We use graphical depictions of maps that were included in the challengers’ brief because those maps show the particular areas of concern. The Legislature did not contest the accuracy of these graphics. In any event, we include them only as visual aids and have, in our analysis, relied solely on the data and maps introduced into evidence during the trial.

. The Reock, or circle-dispersion, method of quantifying compactness "measures the ratio between the area of the district and the area of the smallest circle that can fit around the district.” Apportionment I, 83 So.3d at 635. "This measure ranges from 0 to 1, with a score of 1 representing the highest level of compactness as to its scale.” Id.

. The Area/Convex Hull method, which "measures the ratio between the area of the district and the area of the minimum convex bounding polygon that can enclose the district,” also ranges from 0 to 1, "with a score of 1 representing the highest level of compactness.” Apportionment I, 83 So.3d at 635. "A circle, square, or any other shape with only convex angles has a score of 1" under this measure. Id.

. The two districts are actually represented by members of the Republican Party. The performance data relied on by the parties shows that these two districts are Republican under the 2008 presidential and 2010 gubernatorial elections but Democratic under the 2012 presidential election.

. Perhaps we should take solace in not being accused of "jiggery-pokery.” See King v. Burwell, No. 14-114, - U.S. -, 135 S.Ct. 2480, 2499-50, 192 L.Ed.2d 483, 2015 WL 2473448, at *19 (U.S. June 25, 2015) (Scalia, J., dissenting).

. The specific parameters of the relinquishment and transmission of the record are set forth in a separate order issued by this Court simultaneously with this opinion. Although the dissent criticizes our requirement in that order of dual filings in the trial court and this Court during the relinquishment proceedings, see dissenting op. at 423-24, time is of the essence in bringing finality to the congressional redistricting plan. Requiring dual filings during a relinquishment or other proceeding over which this Court retains jurisdiction is not unusual, and the dual filings allow this Court to ensure it timely has the complete record so that it can act expeditiously.